United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued April 9, 2002 Decided June 14, 2002 

 No. 01-5278

 National Mining Association, et al., 
 Appellants

 v.

 Department of Labor, et al., 
 Appellees

 Appeal from the United States District Court 
 for the District of Columbia 
 (No. 00cv03086)

 Mark E. Solomons argued the cause for appellants. With 
him on the briefs was Laura Metcoff Klaus.

 Sushma Soni, Attorney, United States Department of Jus-
tice, argued the cause for federal appellees. With her on the 
brief were Roscoe C. Howard, Jr., United States Attorney, 
and Mark B. Stern, Attorney, United States Department of 
Justice.

 Thomas E. Johnson argued the cause for appellees United 
Mine Workers of America. With him on the brief were 
Grant Crandall and Judith Rivlin.

 Before: Edwards and Tatel, Circuit Judges, and 
Silberman, Senior Circuit Judge.

 Opinion for the Court filed Per Curiam.

 Per Curiam: This lawsuit challenges regulations issued by 
the Secretary of Labor pursuant to the Black Lung Benefits 
Act, as amended, 30 U.S.C. ss 901-945 (1994) ("BLBA" or 
"Act"). The District Court upheld the regulations against all 
challenges. This appeal followed. For the reasons stated 
herein, we affirm in part and reverse in part. The case will 
be remanded to the District Court with instructions to re-
mand the case to the Department of Labor for further 
proceedings consistent with this opinion.

 I. Background

 The BLBA is a federally administered law providing bene-
fits to coal miners who are totally disabled due to pneumoco-
niosis, also known as black lung disease, and to the surviving 
dependents of miners who died of the disease. Under the 
Act, coal mine operators are responsible for paying benefits 
to miners whose death or total disability due to black lung 
disease arose out of employment in the mines. 30 U.S.C. 
s 932. Black lung disease encompasses a cruel set of condi-
tions that afflict a significant percentage of the nation's coal 
miners with "severe, and frequently crippling, chronic respi-
ratory impairment." Usery v. Turner Elkhorn Mining Co., 
428 U.S. 1, 6 (1976) (citing, inter alia, S. Rep. No. 91-411, at 6 
(1969)). It is caused by the "long-term inhalation of coal 
dust." Id. A rare and serious form of the disease, known as 
"complicated pneumoconiosis," results in pulmonary impair-
ment and respiratory disability. Id. at 7. It can lead to 
cardiac failure and can contribute to other causes of death. 
Id. The purpose of the BLBA "is to satisfy a specific need 
created by the dangerous conditions under which [coal miners 
have] labored--to allocate to the mine operator[s] an actual, 
measurable cost of [their] business." Id. at 19.

 A miner or his survivor may seek benefits under the Act by 
filing a claim with the District Director in the Department of 
Labor's Office of Workers' Compensation Programs 
("OWCP"). After investigating the claim, the District Di-
rector determines whether the claimant is eligible for benefits 
and which employer will be held responsible. See 20 C.F.R. 
ss 725.301-725.423 (2001) (all citations to the Code of Federal 
Regulations will be to the 2001 edition unless otherwise 
noted). If the employer cannot be identified, the claim is paid 
out of the Black Lung Disability Trust Fund ("the Fund"), 
which is financed by a tax on coal. See 30 U.S.C. ss 932, 934; 
26 U.S.C. ss 4121, 9501(d)(1). Either party may appeal the 
District Director's determination and request a hearing be-
fore an Administrative Law Judge ("ALJ"). 20 C.F.R. 
ss 725.450-725.480. The ALJ's decision may be appealed to 
the Department of Labor's Benefits Review Board, id. 
s 725.481, and then to the Court of Appeals for the circuit in 
which the impairment occurred, 33 U.S.C. s 921(c); 20 C.F.R. 
s 725.482.

 In 1997, the Secretary of Labor ("the Secretary," "the 
Department," or "the government") issued a notice of pro-
posed revisions to the rules governing the adjudication of 
miners' claims under the BLBA. See Regulations Imple-
menting the Federal Coal Mine Health and Safety Act of 
1969, as Amended, 62 Fed. Reg. 3338-435 (proposed Jan. 22, 
1997). The Secretary received approximately 200 comments 
and held two public hearings on the proposed rules. The 
Secretary also consulted the National Institute for Occupa-
tional Safety and Health ("NIOSH"), the federal agency 
charged with researching occupational health. See 29 U.S.C. 
s 671. Congress directed the Secretary to consult with 
NIOSH to establish criteria for medical tests to determine 
whether coal miners are totally disabled. 30 U.S.C. s 902(f).

 In 1999, the Secretary issued another notice, announcing 
revisions to certain proposed regulations. See Regulations 
Implementing the Federal Coal Mine Health and Safety Act 
of 1969, as Amended, 64 Fed. Reg. 54,966-55,072 (proposed 
Oct. 8, 1999). After receiving more comments and testimony 
and consulting NIOSH and other experts, the Secretary 

promulgated the final rule, which would go into effect on 
January 19, 2001. See Regulations Implementing the Federal 
Coal Mine Health and Safety Act of 1969, as Amended, 65 
Fed. Reg. 79,920-80,107 (Dec. 20, 2000).

 The appellants in this case include mine operators, insur-
ance companies, and the National Mining Association (collec-
tively "NMA"). The BLBA requires coal mine operators to 
purchase insurance to cover their liabilities under the Act. 
See 30 U.S.C. s 933 (governing employers' insurance ar-
rangements); 20 C.F.R. Part 726 (entitled "Black Lung Bene-
fits; Requirements for Coal Mine Operator's Insurance"). 
The Secretary of Labor anticipates that the new rules will 
impose costs on mine operators in the form of higher insur-
ance premiums. See 65 Fed. Reg. at 80,030. The Secretary's 
initial analysis indicated that, in the long term, the new rules 
would cause operators' insurance premiums to go up by about 
39.3%, resulting in total annual costs to the industry of 
approximately $57.56 million. Id. The Secretary's analysis 
also suggested that the overall approval rate for claims 
against responsible coal mine operators would increase from 
7.33% to no more than 12.18%. Id. at 80,036. It is not clear 
how much of this anticipated increase is attributable to an 
anticipated increase in approval of claims that are already 
pending, and how much is attributable to claims that have not 
yet been filed.

 Almost immediately after the final regulations were an-
nounced, appellants sought declaratory and injunctive relief 
in the United States District Court for the District of Colum-
bia. See Am. Compl. p 1, reprinted in Joint Appendix 
("J.A.") 1. They challenged many of the rules as impermissi-
bly retroactive. See id. pp 19-23. They alleged that many of 
the rules violated the BLBA or applicable provisions of the 
Longshore and Harbor Workers Compensation Act 
("LHWCA" or "Longshore Act"), 33 U.S.C. ss 901-950, many 
provisions of which are incorporated by reference into the 
BLBA by 30 U.S.C. s 932(a). See Am. Compl. pp 24-26. 
They alleged that some of the rules impermissibly shifted the 
burden of proof. See id .pp 27-32. They alleged that certain 
rules ran afoul of the right to a full and fair hearing, treated 

parties unequally, or were arbitrary, capricious, and an abuse 
of discretion in contravention of the Administrative Procedure 
Act ("APA"). See id. pp 33-43. Finally, they alleged that the 
rulemaking procedure was inadequate and that the rules 
violated the due process guarantee of the Constitution. Id. 
pp 44-52. The United Mine Workers of America and other 
black lung advocates, including miners, intervened on behalf 
of the Secretary.

 The District Court granted the NMA limited injunctive 
relief, but ultimately granted the Secretary's motion for sum-
mary judgment, upholding the regulations in every respect. 
Nat'l Mining Ass'n v. Chao, 160 F. Supp. 2d 47 (D.D.C. 2001) 
(Mem. Op.) [hereinafter "NMA"]. Rejecting the Secretary's 
argument that the District Court lacked jurisdiction, the 
court first found that it had jurisdiction pursuant to 28 U.S.C. 
s 1331, because NMA challenged a rulemaking, rather than 
an "order," of DOL. Id. at 54-56. Black lung benefits 
determinations ("orders") may be challenged only in the 
Court of Appeals. 33 U.S.C. s 921(c), (e).

 The District Court next addressed NMA's claim that many 
of the rules were impermissibly retroactive, in part because 
they applied to pending claims as well as claims filed after the 
effective date of the regulations. See NMA, 160 F. Supp. 2d 
at 65. The court agreed with all parties that the Secretary 
was not authorized to promulgate retroactive regulations, but 
found that the challenged regulations were not retroactive, 
because some apply only to newly filed claims, while the 
remainder "simply clarify legal principles that were already 
in effect and [did] not change the substantive standards of 
entitlement." Id. Finally, the District Court upheld the 
regulations against the various substantive challenges. Id. at 
69-90. Appellants now seek review of the District Court's 
determinations.

 II. Discussion

A. Jurisdiction

 The government challenged the District Court's jurisdiction 
to hear appellants' broad-scale attack on the Department's 

regulations and reiterates that argument before us. It is the 
government's contention that the mining companies may only 
challenge the regulations piecemeal, insofar as particular 
provisions are brought into question, by an appeal directly to 
the Court of Appeals from a compensation order of the 
Benefits Review Board. That is so, according to the govern-
ment, because the BLBA provides that a person "adversely 
affected or aggrieved by a final order of the Board may 
obtain review of that order in the United States court of 
appeals for the circuit in which the injury occurred ..." 33 
U.S.C. s 921(c) (emphasis added).

 The obvious difficulty with the government's position is 
that this provision putting exclusive review jurisdiction in the 
Court of Appeals speaks of orders, but Congress in passing 
the APA drew a distinction between orders, which typically 
follow adjudications, and regulations. See National Treasury 
Employees Union v. Weise, 100 F.3d 157, 160 (D.C. Cir. 1996) 
(explaining that courts and Congress use the terms "regula-
tion" and "rule" interchangeably); compare 5 U.S.C. s 551(4) 
(defining "rule") with id. s 551(6) (defining "order"). Indeed, 
the BLBA itself indicates that Congress was using order in 
the same sense it used the term in the APA. The other 
provision the government points to, 33 U.S.C. s 921(e), states 
that "proceedings for suspending, setting aside, or enforcing a 
compensation order, whether rejecting a claim or making an 
award, shall not be instituted otherwise than as provided 
above" (referring to s 921(c) (emphasis added)). That lan-
guage makes rather clear that in s 921(c) Congress used the 
term "order" to refer to an adjudicatory compensation order, 
not the promulgation of a regulation, and therefore the 
preclusion of review other than by s 921(c) would seem not to 
apply to review of a regulation. Since Congress was silent on 
how review of regulations was to be accomplished, it would 
appear accordingly that persons seeking such review would 
be directed by the APA to go to district court. See Work-
place Health & Safety Council v. Reich, 56 F.3d 1465, 1467 
(D.C. Cir. 1995).

 In that regard, the Supreme Court's decision in McNary v. 
Haitian Refugee Center, Inc., 498 U.S. 479 (1991), instructs 

us to read very carefully legislative restrictions on district 
court review of generic challenges to agency action. In the 
Immigration Reform and Control Act of 1986, Congress pro-
vided that there would be "no administrative or judicial 
review of a determination respecting an application for ad-
justment of status" except in accordance with that subsection, 
which eventually provided for judicial review in the Court of 
Appeals. 8 U.S.C. s 1160(e). The Court held that s 210(e) 
of the Reform Act did not deprive a district court of subject 
matter jurisdiction of "general collateral challenges to uncon-
stitutional practices and policies used by the agency in pro-
cessing applications." McNary, 498 U.S. at 492.

 The Court read the phrase "determination respecting an 
application for adjustment of status" to refer only to an 
individual adjudication - not a determination made in a 
regulation. In our case, the word order is more obviously 
confined to an adjudication than the word determination, so 
therefore this case, linguistically, appears a fortiori to 
McNary.1 To be sure, the Court also observed that plaintiffs' 
challenge to the procedures would not easily be remedied by 
individual appeals to the Court of Appeals, a notion we return 
to below. Id. at 496.

 The government points to another Supreme Court case, 
Thunder Basin Coal Company v. Reich, 510 U.S. 200 (1994), 
holding that the Federal Mine Safety and Health Act preclud-
ed district court jurisdiction over a pre-enforcement challenge 
to several Department of Labor regulations. In that case, a 

__________
 1 The Second Circuit has also recognized that the term "order" 
carries a limited meaning. In Merritt v. Shuttle, Inc., 187 F.3d 263 
(2d Cir. 1999) (Merritt I), that court held that Merritt could not 
bring a Bivens claim challenging an FAA order suspending his 
pilot's certificate because 49 U.S.C. s 46110(a) vested review of an 
FAA "order" in the Court of Appeals and his Bivens claim chal-
lenged the merits of the administrative adjudication. By contrast, 
in Merritt v. Shuttle, Inc., 245 F.3d 182, 188 (2d Cir. 2001) (Merritt 
II), the Second Circuit clarified that s 46110(a), which referred only 
to an FAA order, did not preclude district court jurisdiction over 
Merritt's FTCA claim, which did not claim that he was either 
injured or aggrieved by the order suspending his license.

mine operator refused to post the names of two United Mine 
Workers of America employees - not employees of the mine 
operator - who had been chosen by its employees as their 
representatives to "walk around" with federal inspectors. 
The Mine Safety statute authorized the Secretary of Labor to 
seek enforcement of the posting in proceedings before the 
Federal Mine Safety and Health Review Commission. Be-
fore the Secretary could do so, the mine operator, claiming 
rights under both the National Labor Relations Act and the 
Constitution, sought an injunction against the Labor Depart-
ment's position that the mine operator was obliged to post the 
names. The Court held that the District Court lacked juris-
diction over "such" a pre-enforcement challenge in light of the 
comprehensive administrative and judicial review procedures 
culminating in the Court of Appeals. Id. at 208. Although 
the statute was silent on pre-enforcement review, this sort of 
case was thought to be implicitly precluded. The company 
had simply jumped the gun by suing before the Secretary 
issued a citation, and the company's argument that both the 
Constitution and the National Labor Relations Act allowed it 
to exclude non-employee representatives could be meaningful-
ly reviewed in the Court of Appeals. It is important to note 
that the case did not involve a regulation, which is typically 
treated differently from an adjudication. United States v. 
Florida East Coast Ry. Co., 410 U.S. 810, 820-21 (1973). 
Indeed, under the Mine Safety Act safety standards are 
issued as regulations and are explicitly reviewable in the 
Court of Appeals. 30 U.S.C. s 811(d).2

 The government also relies on two circuit court cases, 
Compensation Dep't of Dist. Five v. Marshall, 667 F.2d 336, 
340-44 (3d Cir. 1981), and Louisville & Nashville R.R. v. 
Donovan, 713 F.2d 1243, 1245-47 (6th Cir. 1983), denying pre-
enforcement review under this very statute. The first of 
these, upon which the second relies, involved a request for an 
injunction brought by the United Mine Workers against the 

__________
 2 The Court did not indicate how it would treat the review of a 
regulation that was not a safety standard. Compare Chamber of 
Commerce of the United States v. Dep't of Labor, 174 F.3d 206 
(D.C. Cir. 1999), with id. at 213 (Silberman, J., dissenting).

Labor Department to prevent the Secretary from indepen-
dently examining x-rays presented by those seeking eligibility 
for black lung benefits. The statute obliged the Secretary to 
accept a radiologist's interpretation of an x-ray if certain 
requirements were met. The Secretary's position was that 
although his Office of Workers' Compensation was bound, 
neither an ALJ nor the independent Benefits Review Board 
was so bound, and therefore nothing prevented the Secretary 
from turning over a competing interpretation to the mine 
operator to be used as rebuttal evidence.

 The Third Circuit held that the District Court lacked 
jurisdiction because the "scheme of review" established by 
Congress "for determination of black lung benefits" was 
exclusive; it provided administrative review and then review 
in the Court of Appeals. There was no reason why the 
United Mine Workers could not challenge the Secretary's 
enforcement policy in an individual adjudication before the 
Benefits Review Board and, if necessary, in the Court of 
Appeals. The case therefore bears a strong resemblance to 
Thunder Basin; a plaintiff sought to short-circuit the admin-
istrative process by challenging a Department enforcement 
position in a district court. Compare Compensation Depart-
ment, 667 F.2d at 340, with Thunder Basin, 510 U.S. at 216.

 The Sixth Circuit's Louisville & Nashville R.R. case is 
somewhat more problematic. There, fifteen railroads sought 
and gained an injunction in district court preventing the 
Secretary from extending coverage of the BLBA to railroad 
employees. The Department of Labor had issued guidelines 
defining the statutory term "transportation of coal" to include 
railroad employees if they were transporting coal between the 
extraction site and the tipple and if their work was necessary 
to the extraction process. The Sixth Circuit reversed, follow-
ing the Third Circuit's analysis in Compensation Department, 
pointing out that any railroad could contest the Secretary's 
position before the Benefits Review Board, and if necessary 
challenge an order awarding benefits in the Court of Appeals. 
Although the guidelines involved seem a bit more generic 
than the enforcement policies implicated in either Thunder 
Basin or Compensation Department, the Secretary had not 

issued a formal regulation, as is true in our case, and again as 
in Compensation Department, 667 F.2d at 334, there was no 
reason to believe that a railroad's legal position, if correct, 
could not be fully remedied through review in the Court of 
Appeals. Louisville & Nashville RR, 713 F.2d at 1246-47.3

 In the case at bar the Secretary of Labor has chosen, as 
was not true in any of the cases upon which the government 
relies, to gain all of the law-declaring attributes of an APA 
notice-and-comment rulemaking. Trans-Pacific Freight Con-
ference of Japan/Korea v. Federal Maritime Comm'n, 650 
F.2d 1235, 1244-45 (D.C. Cir. 1980) (distinguishing notice-
and-comment rulemaking, which is "prospective in operation 
and general in scope," from adjudications). Accordingly, the 
cases upon which she relies do not really support her position. 
Moreover, the regulations before us are challenged primarily 
on the ground that they are impermissibly retroactive. To 
determine whether that is true it is necessary to analyze 
carefully all of the regulations together as well as the entire 
rulemaking process, which would not be feasible in individual 
adjudications dealing with particular regulatory provisions. 
Cf. Kreschollek v. Southern Stevedoring Co., 78 F.3d 868 (3d 
Cir. 1996) (holding that 33 U.S.C. s 921 did not deprive a 
district court of jurisdiction over plaintiff's constitutional 
claim as to the lack of a pre-deprivation hearing because the 
statutory review process would be insufficient to provide him 
with the full relief to which he might be entitled). In that 
respect, this case is closer to McNary than Thunder Basin. 
As such, the District Court did have jurisdiction over appel-
lants' challenges, to which we now turn.

B. Retroactivity

 Appellants argue that some of the provisions in the new 
regulations are impermissibly retroactive. In particular, ap-

__________
 3 The Seventh Circuit, by contrast, has explained that even "an 
order denying or revoking a certificate of exemption, not being a 
compensation order, would not be subject to the special review 
procedure established by 33 U.S.C. s 921." Maxon Marine, Inc. v. 
Director, Office of Workers' Compensation Programs, 39 F.3d 144, 
146 (7th Cir. 1994).

pellants cite the following rules: ss 718.104(d), 718.201(a)(2), 
718.201(c), 718.204(a), 725.101(a)(6), 725.101(a)(31), 725.204, 
725.212(b), 725.213(c), 725.214(d), 725.219(c), 725.219(d), 
725.309(d), and 725.701. We will address each rule in turn.

 1. Legal Principles Governing Retroactivity
 
 The general legal principles governing retroactivity are 
relatively easy to state, although not as easy to apply. An 
agency may not promulgate retroactive rules absent express 
congressional authority. Bowen v. Georgetown Univ. Hosp., 
488 U.S. 204, 208 (1988). A provision operates retroactively 
when it "impair[s] rights a party possessed when he acted, 
increase[s] a party's liability for past conduct, or impose[s] 
new duties with respect to transactions already completed." 
Landgraf v. USI Film Prods., 511 U.S. 244, 280 (1994). In 
the administrative context, a rule is retroactive if it " 'takes 
away or impairs vested rights acquired under existing law, or 
creates a new obligation, imposes a new duty, or attaches a 
new disability in respect to transactions or considerations 
already past.' " Nat'l Mining Ass'n v. United States Dep't of 
Interior, 177 F.3d 1, 8 (D.C. Cir. 1999) (quoting Ass'n of 
Accredited Cosmetology Sch. v. Alexander, 979 F.2d 859, 864 
(D.C. Cir. 1992)). The critical question is whether a chal-
lenged rule establishes an interpretation that "changes the 
legal landscape." Id. (quoting Health Ins. Ass'n of Am., Inc. 
v. Shalala, 23 F.3d 412, 423 (D.C. Cir. 1994)). It is undisput-
ed here that the Secretary was not authorized to promulgate 
retroactive rules governing BLBA benefits determinations. 
Hence, the parties dispute only whether the challenged regu-
lations are retroactive.

 The Secretary argues that none of the rules is retroactive, 
even as applied to pending claims, because all are merely 
procedural and do not confer new substantive rights or 
liabilities. See Landgraf, 511 U.S. at 275 ("Changes in proce-
dural rules may often be applied in suits arising before their 
enactment without raising concerns about retroactivity."). It 
is true that purely procedural rules often do not operate 
retroactively even when applied to transactions predating 
their institution. This is because such rules often regulate 

only "secondary rather than primary conduct." Id. Where a 
"procedural" rule changes the legal landscape in a way that 
affects substantive liability determinations, however, it may 
operate retroactively. See Martin v. Hadix, 527 U.S. 343, 
359 (1999) (noting that, in Landgraf, the Court "took pains to 
dispel the 'suggest[ion] that concerns about retroactivity have 
no application to procedural rules' ") (quoting Landgraf, 511 
U.S. at 275 n.29).

 Rather than rely on "procedural" and "substantive" labels, 
a court must "ask whether the [regulation] operates retroac-
tively." Id. This inquiry involves a "commonsense, function-
al judgment about 'whether the new provision attaches new 
legal consequences to events completed before its enact-
ment.' " Id. at 357-58 (quoting Landgraf, 511 U.S. at 270). 
Thus, where a rule "changes the law in a way that adversely 
affects [a party's] prospects for success on the merits of the 
claim," it may operate retroactively even if designated "proce-
dural" by the Secretary. Ibrahim v. District of Columbia, 
208 F.3d 1032, 1036 (D.C. Cir. 2000).

 The Secretary argues, and the District Court agreed, that 
none of the challenged rules changes the landscape, because 
the rules merely clarify the Secretary's position or conform to 
cases decided by the Courts of Appeals. In analyzing each 
new regulation, we first look to see whether it effects a 
substantive change from the agency's prior regulation or 
practice. If a new regulation is substantively consistent with 
prior regulations or prior agency practices, and has been 
accepted by all Courts of Appeals to consider the issue, then 
its application to pending cases has no retroactive effect. If a 
new regulation is substantively inconsistent with a prior 
regulation, prior agency practice, or any Court of Appeals 
decision rejecting a prior regulation or agency practice, it is 
retroactive as applied to pending claims.

 Some of the challenged rules here codify the results of a 
case in one circuit while effectively reversing a case in 
another circuit in which the court rejected the Secretary's 
practice or policy. Such rules change the legal landscape as 
applied to cases that were pending when the regulations were 

promulgated. See National Mining, 177 F.3d at 8 (explain-
ing that "[w]here before there was 'a range of possible 
interpretations,' " of the relevant statutes, a rule may estab-
lish " 'a precise interpretation' " that changes the legal land-
scape) (citing Health Ins. Ass'n, 23 F.3d at 423-24). It goes 
without saying that such rules change the law for cases 
pending in the circuit that previously rejected the Secretary's 
approach. In those cases, the operators insured against the 
filed claims based on the law in effect at the time the claims 
were filed. Less obviously, the regulations preclude the 
courts in other circuits from adopting the view of their sister 
court rejecting the Secretary's position, a possibility that was 
still available when the cases were initially filed. Thus, to the 
extent that a new rule reflects a substantive change from the 
position taken by any of the Courts of Appeals and is likely to 
increase liability, that rule is impermissibly retroactive as 
applied to pending claims.

 2. Application of Legal Principles to Challenged Rules
 
 We find some of the challenged rules to be impermissibly 
retroactive as applied to claims that were pending on the 
regulations' effective date. None of the new regulations is 
retroactive as to claims filed on or after the effective date. 
The distinction between pending and newly filed claims is one 
on which appellants rely in their briefs. See Br. for Appel-
lants at 15 n.6 (stating that the relevant date for purposes of 
retroactivity is the date the claim is filed, as that is the last 
date on which the operators' and insurers' transactions are 
closed and expectations are settled); Reply Br. for Appellants 
at 4 (arguing that the Secretary "fails to explain why key 
provisions are expressly made retroactively applicable to 
pending and previously filed claims," while saying nothing 
about claims filed after the effective date). Moreover, NMA 
never affirmatively argues that the rules should be considered 
retroactive as applied to claims first filed after the effective 
date. Nor would the record support such an argument.

 Appellants do argue that the regulations are retroactive as 
applied to newly filed claims when those claims are "subse-
quent claims." We reject this argument. Under both the 

new and old regulations, a miner whose claim is initially 
denied may later file a new claim if he subsequently develops 
black lung disease or can show that another condition of 
entitlement has changed. See 20 C.F.R. s 725.309(d). As we 
explain in more detail below, a claimant bringing such a claim 
still bears the burden of demonstrating that he meets all of 
the relevant conditions. For this reason, we agree with the 
Secretary that such claims are new claims to which the 
application of the new regulations is permissible.

 20 C.F.R. s 718.104(d): The "treating physician rule" in-
structs the officer adjudicating a miner's claim to consider the 
relationship between the miner and any treating physician 
whose report is submitted when determining whether the 
miner suffers from black lung disease and whether he was 
totally disabled or died because of the disease. The disputed 
rule instructs the officer to consider the nature of the rela-
tionship (a doctor's opinion is entitled to more weight if he 
has treated the miner for pulmonary, as opposed to non-
pulmonary, conditions), its duration, the frequency of treat-
ment, and the extent of treatment in weighing the doctor's 
opinion along with the other evidence. 20 C.F.R. 
s 718.104(d)(1)-(4). The regulation provides that in "appro-
priate cases," the doctor-patient relationship "may constitute 
substantial evidence in support of the adjudication officer's 
decision to give that physician's opinion controlling weight," 
but only when the weight given is based on the credibility of 
that physician's opinion "in light of its reasoning and docu-
mentation, other relevant evidence and the record as a 
whole." Id. s 718.104(d)(5) (emphasis added). It applies 
both to pending claims and claims filed after the regulations' 
effective date. See id. ss 718.2, 725.4(a) (setting forth the 
applicability of the regulations in Part 718). The old rule said 
nothing about the relationship between the miner and the 
evaluating doctor. See 20 C.F.R. s 718.104 (2000).

 We hold that treating physician rule is not retroactive, 
because it codifies judicial precedent and does not work a 
substantive change in the law. NMA argues that the rule 
contravenes a number of court decisions. This argument is 
unfounded. The consensus among courts has been that an 

agency adjudicator may give weight to the treating physi-
cian's opinion when doing so makes sense in light of the 
evidence and the record, but may not mechanistically credit 
the treating physician solely because of his relationship with 
the claimant. For example, in Peabody Coal Co. v. McCand-
less, 255 F.3d 465, 469 (7th Cir. 2001), relied upon by NMA, 
the Seventh Circuit restated its disapproval of "any mechani-
cal rule that the views of a treating physician prevail" (citing 
Consolidation Coal Co. v. OWCP, 54 F.3d 434, 438 (7th Cir. 
1995)). Instead, the Seventh Circuit has repeatedly demand-
ed that the adjudicator explain his or her decision to credit 
the treating physician in terms of "a medical reason," id., or 
explain why the opinion of the treating physician was viewed 
to be "better reasoned" than the opinions of non-treating 
physicians, Consolidation Coal Co., 54 F.3d at 438; see also 
Amax Coal Co. v. Beasley, 957 F.2d 324, 327 (7th Cir. 1992) 
(holding, in a case where both doctors agreed that coal 
exposure probably had not caused the miner's death, that an 
ALJ may not disregard uncontradicted medical evidence nor 
give more weight to the examining physician "solely because 
that doctor personally treated the claimant") (emphasis in 
original). These holdings are codified in the new 
s 718.104(d), which by its terms allows an adjudicator to give 
weight to the treating physician's opinion only when that 
decision is supported by the opinion's "reasoning and docu-
mentation" in light of the other evidence in the record. 20 
C.F.R. s 718.104(d)(5).

 The other cases cited by appellants similarly express the 
principles embodied in the new rule. In Sterling Smokeless 
Coal Co. v. Akers, 131 F.3d 438, 441 (4th Cir. 1997), the 
Fourth Circuit vacated an award of benefits where the ALJ 
had "mechanistically credited, to the exclusion of all other 
testimony," the opinions of two examining physicians who had 
only treated the miner for a month, despite allegations that 
the two doctors had not independently evaluated the miner 
themselves. The court acknowledged that the opinions of 
treating physicians can be "deserv[ing of] especial consider-
ation," but rejected any requirement or presumption that 
their opinions automatically be given greater weight. Id. 

(quoting Grizzle v. Pickands Mather & Co., 994 F.2d 1093, 
1097 (4th Cir. 1993)).

 Likewise, the Sixth Circuit recently summarized its law in 
Peabody Coal Co. v. Groves, 277 F.3d 829 (6th Cir. 2002). 
Reviewing past cases, the court explained that opinions of 
treating physicians are entitled to greater weight, but should 
not "automatically be presumed to be correct"; rather, "their 
opinions should be 'properly credited and weighed.' " Id. at 
834 (quoting Tussey v. Island Creek Coal Co., 982 F.2d 1036, 
1042 (6th Cir. 1993)). Adjudicators must "examine the medi-
cal opinions of treating physicians on their merits and ... 
make a reasoned judgment about their credibility." Id.; 
accord Griffith v. Director, OWCP, 49 F.3d 184, 186-87 (6th 
Cir. 1995) (holding that an ALJ was not required to give 
greater weight to the opinion of the treating physician where 
the physician was equivocal as to the cause of the miner's 
disease).

 In short, appellants do not cite a single case from any 
circuit in which a Court of Appeals espoused principles at 
odds with the new rule embodied in s 718.104(d). As the 
cases demonstrate, the courts to consider the issue have 
adopted the balanced policy reflected in the new rule. Thus, 
the rule does not upset settled expectations, and it is not 
retroactive as applied to pending claims for benefits.

 20 C.F.R. s 718.201(a)(2): NMA argues that the new rule 
in s 718.201(a), which defines pneumoconiosis, is impermissi-
bly retroactive. Section 718.201(a) parrots the statutory defi-
nition of pneumoconiosis, i.e., "a chronic dust disease of the 
lung and its sequelae, including respiratory and pulmonary 
impairments, arising out of coal mine employment." See 30 
U.S.C. s 902(b). The regulation goes on to define pneumoco-
niosis as including both medical or "clinical" pneumoconiosis 
and statutory or "legal" pneumoconiosis. 20 C.F.R. 
s 718.201(a). Legal pneumoconiosis is defined to include 
"any chronic lung disease or impairment ... arising out of 
coal mine employment," including "any chronic restrictive or 
obstructive pulmonary disease arising out of coal mine em-
ployment." Id. s 718.201(a)(2).

 NMA challenges as retroactive the inclusion of restrictive 
or obstructive pulmonary disease in the definition of pneumo-
coniosis. It argues that most courts require individual min-
ers to prove the causal relationship between mining and their 
obstructive lung disease, and that the new rule will change 
this. This argument is misplaced. NMA concedes that the 
record supports the premise that obstructive lung disease 
may be caused by mining exposure and can contribute to a 
miner's disability. Br. for Appellants at 17 n.8. The new 
rule does no more than reflect this reality. It does not, as 
appellants suggest, create a presumption that all or even 
most obstructive disease is caused by exposure to coal dust. 
The District Court correctly found that, under both the old 
and new regulations, "each miner bear[s] the burden of 
proving that his obstructive lung disease did in fact arise out 
of his coal mine employment." NMA, 160 F. Supp. 2d at 79 
(quoting 65 Fed. Reg. at 79,938) (emphasis added).

 NMA also alleges that the preamble to the regulations 
impermissibly suggests that an adjudicator may ignore a 
medical report if the reporting doctor concludes that a min-
er's obstructive lung disease was caused by smoking, rather 
than mining. This objection is entirely meritless. The regu-
lation's plain text in no way indicates that medical reports will 
be excluded if they conclude that a particular miner's obstruc-
tive disease was caused by smoking, rather than mining. 
Indeed, the preamble itself states that the revised definition 
does not alter the requirement that individual miners must 
demonstrate that their obstructive lung disease arose out of 
their work in the mines. See 65 Fed. Reg. at 79,938. And 
appellants acknowledge that this regulatory statement is ac-
ceptable. Br. for Appellants at 17 n.8. To the extent that 
appellants' objection is based on anticipated misapplications 
of the rule by agency adjudicators, it is unripe for review. 
Appellants may object to applications of the rule only in the 
context of concrete cases.

 20 C.F.R. s 718.201(c), 725.309(d): Section 718.201(c) states 
that pneumoconiosis is "recognized as a latent and progres-
sive disease which may first become detectable only after the 
cessation of coal mine dust exposure." Appellants argue that 

this regulatory statement is impermissibly retroactive, be-
cause the question whether pneumoconiosis is latent and 
progressive is unsettled. This contention is based on a false 
reading of the rule.

 Appellants acknowledge that at least one rare type of 
pneumoconiosis is both latent and progressive, but argue that 
the more common "simple pneumoconiosis" is not. Br. for 
Appellants at 17. During oral argument, the Secretary con-
ceded that the most common forms of pneumoconiosis are not 
latent. Moreover, the Secretary acknowledged that latent 
and progressive pneumoconiosis is rare, occurring in a small 
percentage of cases by all accounts. Tr. of Oral Arg. at 52-55. 
Nothing in the disputed rule says otherwise. The rule simply 
prevents operators from claiming that pneumoconiosis is nev-
er latent and progressive. The medical literature makes it 
clear that pneumoconiosis may be latent and progressive, and 
appellants do not dispute this point.

 NMA's concern about the definition of pneumoconiosis as 
latent and progressive is tied to the fact that, under 20 C.F.R. 
s 725.309(d), a claimant whose claim was previously denied 
may file a subsequent claim. The subsequent claim will be 
denied unless the claimant demonstrates that one of the 
applicable conditions of entitlement has changed since the 
claim was denied. Id. The "applicable condition" must be 
one of the conditions on which the claim was denied in the 
first place. Id. s 725.309(d)(2). Thus, a miner who was 
originally found not to suffer from black lung disease may file 
again if he develops the disease subsequently. Any such 
claimant, however, must still prove that he now has pneumo-
coniosis and that his disease arose out of employment in coal 
mines.

 On its own, s 725.309(d) is not retroactive. First, it applies 
only to claims filed after the regulations' effective date and 
has no application to pending subsequent claims. See id. 
s 725.2(c). In any event, the new regulation, in relevant part, 
mirrors the prior s 725.309(d), which provided that a subse-
quent claim will be denied unless the deputy commissioner 
determines that "there has been a material change in condi-

tions." 20 C.F.R. s 725.309(d) (2000). Counsel acknowl-
edged at oral argument that, under the old regulatory regime, 
a claimant who had been denied benefits could reapply when 
relevant conditions changed. Tr. of Oral Arg. at 39. The 
new rule does not allow anything more. Because it is not 
substantively new, it does not change the legal landscape.

 Nor is s 725.309(d) retroactive in combination with the rule 
recognizing that pneumoconiosis can be latent and progres-
sive. While appellants express concern that the regulations 
allow claimants to relitigate old claims under an irrebuttable 
presumption that the miners' pneumoconiosis is progressive, 
the rules afford no such presumption. The fundamental 
requirement that the claimant must prove a change in a 
relevant condition (such as whether he developed pneumoco-
niosis after his claim was denied) has not changed. A miner 
will only be successful in his subsequent claim if he has 
actually developed pneumoconiosis or another relevant condi-
tion of entitlement in the interim.

 20 C.F.R. s 718.204(a): The "total disability rule" provides 
that nonpulmonary diseases that "cause[ ] an independent 
disability unrelated to the miner's pulmonary or respiratory 
disability, shall not be considered in determining whether a 
miner is totally disabled due to pneumoconiosis." The con-
tested language does not appear in the prior version of the 
regulation. We find that the rule is retroactive as applied to 
pending cases, because it changes the legal landscape in a 
way that is likely to affect liability determinations.

 NMA contends that the rule's purpose and effect is to 
overrule a Seventh Circuit decision in Peabody Coal Co. v. 
Vigna, 22 F.3d 1388 (7th Cir. 1994). The record supports this 
suggestion. See 62 Fed. Reg. at 3344-45 (stating that the 
new regulation "makes clear the Department's disagreement 
with the holding in [Vigna]" and was "designed to ensure that 
the Seventh Circuit's view will not be applied outside that 
circuit to cases arising under part 718"). The District Court 
held that the regulation codified existing law and the Secre-
tary's prior interpretation. NMA, 160 F. Supp. 2d at 67-68 
(citing many cases and adding a "But see" citation to Vigna).

 In Vigna, a miner who had mined for forty years suffered a 
stroke and became totally disabled. 22 F.3d at 1390. The 
miner was also a longtime smoker. Id. The Seventh Circuit 
held, contrary to the ALJ's finding, that the coal company 
successfully rebutted the presumption that the miner's dis-
ability arose from his coal mine employment. Id. at 1394. 
The court found that the evidence left no doubt that the 
miner's employment did not contribute to his stroke, which 
was the cause of his total disability. Id. At the time of the 
stroke, there was no evidence that the miner had pneumoco-
niosis. Id.

 Under the new rule, the adjudicator would not be able to 
consider a nonpulmonary condition (such as a stroke) at all in 
determining whether the miner was totally disabled due to 
pneumoconiosis. Instead, the adjudicator would have to de-
termine whether the miner was totally disabled due to pneu-
moconiosis without considering his unrelated, nonpulmonary 
disability. The new regulation thus changes the legal land-
scape by precluding adjudicators from considering unrelated 
medical disabilities, reversing the rule in the Seventh Circuit, 
and precluding any other circuit from adopting the Seventh 
Circuit's interpretation. It cannot be said to be merely 
"procedural," because it has a direct effect on the determina-
tion of liability.

 In finding the rule to be impermissibly retroactive as 
applied to pending cases, we do not, of course, intend to affect 
the law in circuits that have adopted or might adopt positions 
that conform with the Secretary's interpretation. See, e.g., 
Cross Mountain Coal, Inc. v. Ward, 93 F.3d 211, 217 (6th Cir. 
1996) (holding that "the fact that claimant may, or may not, 
also be disabled by a back injury is not grounds for denying 
his claim for benefits"). Instead, the effect of our ruling is to 
leave the state of the law on this question exactly as it was 
prior to the regulations' promulgation for cases that had 
already been filed when the regulations were promulgated.

 20 C.F.R. s 725.701: The rule embodied in s 725.701 cre-
ates a rebuttable presumption that when a miner who is 
eligible for black lung benefits receives medical treatment for 

a pulmonary disorder, the disorder is "caused or aggravated 
by the miner's pneumoconiosis." 20 C.F.R. s 725.701(e). 
The employer may rebut the presumption with "credible 
evidence that the medical service or supply provided was for 
a pulmonary disorder apart from those previously associated 
with the miner's disability" or was beyond the treatment 
necessary to treat the covered disorder, or "was not for a 
pulmonary disorder at all." Id. The regulation codifies the 
so-called Doris Coal presumption, named for a Fourth Circuit 
case that adopted the presumption before it was included in 
the new regulations. See Doris Coal Co. v. Director, OWCP, 
938 F.2d 492, 496-97 (4th Cir. 1991) ("Since most pulmonary 
disorders are going to be related or at least aggravated by 
the presence of pneumoconiosis, when a miner receives treat-
ment for a pulmonary disorder, a presumption arises that the 
disorder was caused or at least aggravated by the miner's 
pneumoconiosis, making the employer liable for the medical 
costs."). The Fourth Circuit later reaffirmed and clarified 
the presumption, using language that was mirrored in the 
new regulation. See Gulf & W. Indus. v. Ling, 176 F.3d 226, 
233 (4th Cir. 1999) (holding that the employer can rebut the 
presumption by producing "credible evidence that the treat-
ment rendered is for a pulmonary disorder apart from those 
previously associated with the miner's disability, or is beyond 
that necessary to effectively treat a covered disorder, or is 
not for a pulmonary disorder at all").

 NMA argues that the regulation codifying the judicial 
presumption is retroactive as applied to pending cases, and 
we agree. The rule is not reflected in the prior regulation, 
even though it may reflect the Secretary's longstanding poli-
cy. See Doris Coal, 938 F.2d at 496-97. Moreover, the rule 
contradicts the Sixth Circuit's holding in Glen Coal Co. v. 
Seals, 147 F.3d 502 (6th Cir. 1998). In that case, the court 
held that the Doris Coal presumption is permissible under 
the APA, because it only reallocates the burden of production, 
not the burden of proof. Id. at 512-13. Nonetheless, the 
court struck down the presumption as inconsistent with Sixth 
Circuit law, in part because it found that the creation of such 
judicial presumptions ran afoul of the BLBA's statutory goal 

of uniformity. Id. at 513-14 (citing Director, OWCP v. Green-
wich Collieries, 512 U.S. 267 (1994)). The regulation changes 
the outcome for cases that have already been filed in the 
Sixth Circuit and any other circuit that would have rejected 
Doris Coal. Our holding is, of course, not intended to affect 
the law in the Fourth Circuit or any other circuit that would 
have embraced the Doris Coal presumption. That judicial 
presumption remains the law in the circuits that adopt it. 
Our holding simply prevents the Secretary from imposing the 
presumption, in the form of a new regulation, on all of the 
other circuits for cases that were filed before the regulations 
were promulgated.

 20 C.F.R. s 725.101(a)(6): The rule propounded in 
s 725.101(a)(6) defines "benefits" to include any expenses 
related to the medical examination and testing authorized 
pursuant to s 725.406, which requires the Department of 
Labor to provide each applicant for benefits with a pulmonary 
evaluation at no expense to the miner. The new 
s 725.101(a)(6) conforms the regulatory definition of "bene-
fits" to s 725.406, both the old and new versions. The prior 
version of s 725.406(c) already provided that the cost of the 
medical examination would be paid by the Fund and that the 
Fund would be reimbursed "by an operator, if any, found 
liable for the payment of benefits to the claimant." 20 C.F.R. 
s 725.406(c) (2000). Likewise, the new s 725.406(e) provides 
that the cost of the medical examination will be paid by the 
Fund and that the Fund will be reimbursed "by an operator, 
if any, found liable for the payment of benefits to the claim-
ant."

 NMA argues that s 725.101(a)(6) retroactively shifts to the 
employer the cost of the medical examination provided under 
s 725.406. NMA recognizes that the cost always has been 
shifted under s 725.406 when an operator is found liable for 
the payment of benefits. Its challenge is based on the 
misperception that the new rule shifts the cost of the medical 
examination even when the miner does not prevail. This is 
incorrect. The cost shifts to the employer only when "bene-
fits" are awarded. When no benefits are awarded, the cost of 
the examination presumably will continue to be paid by the 

Fund, as set forth in s 725.406. Appellants have not pointed 
to anything in the new definition that departs from the 
system already in place under the old s 725.406(c). Thus, the 
new definition changes nothing and is not impermissibly 
retroactive.

 20 C.F.R. s 725.101(a)(31): The rule in s 725.101(a)(31) 
provides that "[a] payment funded wholly out of general 
revenues shall not be considered a payment under a workers' 
compensation law." This provision is significant because the 
benefits payable under the BLBA must be offset by any 
amount the miner receives for his black lung disability under 
a state or federal workers' compensation law. See 30 U.S.C. 
s 932(g). NMA agrees that the new rule reflects prior 
agency practice, but argues that it is nonetheless retroactive 
as applied to pending cases because at least one Court of 
Appeals has rejected the agency's practice. We agree.

 In Director, OWCP v. Eastern Associated Coal Corp., 54 
F.3d 141 (3d Cir. 1995), the Third Circuit declined to defer to 
the Director of the OWCP's policy of not reducing a miner's 
BLBA benefits by the amount that he received from general 
revenues under a state occupational disease compensation act. 
The court agreed that the statutory reference to "workers' 
compensation law" was ambiguous. However, the old regula-
tion said nothing about payments funded out of general 
revenues, so the court declined to exclude workers' compensa-
tion payments funded out of general revenues. Id. at 147-49; 
20 C.F.R. s 725.101(a)(4) (2000). The court suggested that 
the Secretary rewrite the regulations to achieve the agency's 
regulatory goal. Id. at 149. This is exactly what the Secre-
tary did in promulgating 20 C.F.R. s 725.101(a)(31). It would 
be impermissibly retroactive, however, to apply the new 
regulation to claims that were already pending when the new 
regulation took effect. It would also be retroactive to apply 
the regulation to adjust the payments being made on settled 
or resolved claims. Of course, other circuits remain free to 
apply the Secretary's longstanding interpretation of the prior 
regulation to pending claims. The regulation is not imper-
missibly retroactive as applied to claims filed after the regula-
tions' effective date.

 20 C.F.R. ss 725.204, 725.212(b), 725.213(c), 725.214(d), 
725.219(c), (d): These regulations, as applied to claims other 
than those filed after the regulations' effective date, are 
impermissibly retroactive, because they expand the scope of 
coverage by making more dependents and survivors eligible 
for benefits. For example, the new s 725.204 describes 
criteria for determining whether a claimant qualifies for 
augmented benefits as a miner's spouse. The new version of 
the regulation eliminates a provision in the prior version that 
essentially prevented a miner from having more than one 
qualifying spouse for purposes of augmented benefits. Com-
pare 20 C.F.R. s 725.204(a)(4) with 20 C.F.R. s 725.204(d)(1) 
(2000). Similarly, under the new 20 C.F.R. s 725.212(b) and 
s 725.214(d), a miner could have more than one surviving 
spouse if he divorced and remarried during the pertinent 
period. Sections 725.209 and 725.219 address the determina-
tion of the miner's dependent children. Section 725.213(c) 
provides that a surviving spouse or surviving divorced spouse 
whose entitlement to benefits is terminated because she 
remarries may thereafter again become entitled to benefits, 
either by divorcing or through the death of her successor 
spouse.

 The Secretary recognizes that the new definitions expand 
the scope of liability, but defends the expansion as necessary 
to conform to the 1990 amendments to the Social Security 
Act, portions of which are incorporated into the BLBA. See 
30 U.S.C. s 902(a)(2), (e) (incorporating various Social Securi-
ty Act definitions found at 42 U.S.C. s 416). The District 
Court agreed, holding that the revisions "bring the regula-
tions into conformity with changes made by Congress in 1990 
to the" Social Security Act's definitions of "dependent wife" 
and other key terms. NMA, 160 F. Supp. 2d at 69.

 The Secretary's position as to the new provisions' applica-
tion remains unclear. In its brief, the Secretary suggests 
that the expanded definitions apply to all BLBA claims filed 
after the 1990 amendments to the Social Security Act. Pre-
sumably, this could even affect payments made on claims that 
were finally adjudicated before the new regulations were 
promulgated. In a post-hearing chart submitted pursuant to 

an order of this court, the Secretary stated that the provi-
sions would apply to all claims pending on the new regula-
tions' effective date, as well as to claims filed after that date, 
and to all benefit payments made after that date, including 
still-open claims filed on or after, or pending on, August 18, 
1978. See also 20 C.F.R. s 725.2 (setting forth the applicabil-
ity of the provisions).

 In either case, we hold that it would be unlawfully retroac-
tive to apply the definitions to any claims other than those 
filed on or after the regulations' effective date. Before the 
effective date, mine operators had no notice of the new 
definitions, for they were never incorporated in the old regu-
lations. The Secretary and intervenors contend that the 
Secretary had changed the functional definitions as early as 
1994 to conform with the 1990 Social Security Act amend-
ments, by changing the Department of Labor's procedural 
manual. Tr. of Oral Arg. at 80-84. There are two problems 
with this argument. The first is that counsels' citation to the 
record does not bear out the claim. Counsel cited 65 Fed. 
Reg. 79,964 in support of the argument that the Secretary 
had already adopted these new definitions as far back as 
1994. But the cited page states only that, since 1994, the 
Secretary's procedure manual has provided that when a sur-
viving spouse and a surviving divorced spouse both qualify, 
each is entitled to full benefits. This citation does not 
address the other challenged regulations, such as those deal-
ing with surviving children and those addressing surviving 
spouses who become ineligible and then become eligible 
again. The second problem is that the Secretary's prior 
practice was encapsulated only in a manual, not in a regula-
tion promulgated pursuant to notice-and-comment rulemak-
ing. There is nothing to indicate that the cited manual 
purported to state substantive rules or that it was generally 
known by and available to regulated parties. The Secretary 
cannot bind parties to substantive rules of which they had no 
notice.

 The Secretary argues that application of the revised defini-
tions to all claims filed after the 1990 amendment date is 
merely a correct application of the law in effect since that 

time. The Secretary relies on Regions Hospital v. Shalala, 
522 U.S. 448, 456 (1998), in which the Court held that the 
government's reaudit rule was not impermissibly retroactive 
because it merely called for the correct "application of the 
cost-reimbursement principles in effect" when the costs were 
incurred. By contrast, the instant regulations would actually 
change the scope of liability for claims that were filed at a 
time when these rules were not in effect. The decision in 
Regions Hospital does not support an argument that the 
Secretary may apply newly updated regulations retroactively 
to pending claims that were initiated before the change. 
Claims that have been resolved or settled, and claims that 
were filed after the effective date of the new rules, are not 
affected by this holding.

C. Substantive Challenges

 In considering NMA's challenges to the revised regulations, 
we are guided by well-accepted principles of administrative 
law. To the extent NMA argues that the regulations conflict 
with the statute, we begin by asking whether "Congress has 
directly spoken to the precise question at issue. If the intent 
of Congress is clear, that is the end of the matter; for the 
court, as well as the agency, must give effect to the unambig-
uously expressed intent of Congress." Chevron, U.S.A., Inc. 
v. Natural Res. Def. Council, 467 U.S. 837, 842 (1984). If, 
however, "the statute is silent or ambiguous with respect to 
the specific issue," we defer to the agency's reasonable con-
struction of that statute. Id. at 843. As for NMA's arbitrary 
and capricious challenges, we will uphold the regulations as 
long as they "conform to certain minimal standards of ration-
ality." Small Refiner Lead Phase-Down Task Force v. EPA, 
705 F.2d 506, 521 (D.C. Cir. 1983) (citation and internal 
quotation marks omitted). Though agencies have a duty of 
reasoned decisionmaking, see Motor Vehicle Mfrs. Ass'n v. 
State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983), we 
"presume the validity of agency action," Kisser v. Cisneros, 
14 F.3d 615, 618 (D.C. Cir. 1994), and may vacate only if the 
regulation is unsupported by substantial evidence, or if the 
agency has made a clear error in judgment, see Citizens to 
Preserve Overton Park v. Volpe, 401 U.S. 402, 415-16 (1971). 

We give particular deference to an agency's promulgation of 
evidentiary rules governing its own adjudications; the agen-
cy's defense of those regulations need only be "reasonable" so 
long as they are not "inconsistent with a federal statute," 
such as the APA. Chem. Mfrs. Ass'n v. Dep't of Transp., 105 
F.3d 702, 706 (D.C. Cir. 1997). Finally, to the extent NMA 
argues that where, as here, we consider a challenge to a 
recently promulgated regulation, "[i]t is not uncommon ... 
that ... the meaning of the disputed provisions does not 
appear clearly until the case is before the courts of appeals. 
We typically accept the agency's construction - which often 
eliminates or narrows the dispute - because we recognize the 
agency is entitled to deference as to the meaning of its own 
regulation." Nat'l Mining Ass'n v. Babbitt, 172 F.3d 906, 911 
(D.C. Cir. 1999). And in such cases, that construction may be 
expressed in the agency's brief or even at oral argument.

 With these standards in mind, we consider each section of 
the revised regulations challenged by NMA.

 Pneumoconiosis Definition

 As revised, s 718.201(a) largely repeats the pneumoconiosis 
definition contained in the regulation's prior version but 
divides that definition into two groups, "clinical" pneumoconi-
osis ("those diseases recognized by the medical community as 
pneumoconiosis") and "legal" pneumoconiosis ("any chronic 
lung disease or impairment ... arising out of coal mine 
employment"). Compare 20 C.F.R. s 718.201 (2000) with 20 
C.F.R. s 718.201(a) (2001). This revision merely adopts a 
distinction embraced by all six circuits to have considered the 
issue, see, e.g., Ling, 176 F.3d at 231-32; see also 65 Fed. 
Reg. at 79,938 (citing six circuit court cases), and, contrary to 
NMA's repeated assertions, neither "expand[s]" nor "rede-
fine[s]" the meaning of pneumoconiosis beyond its statutory 
definition, Br. for Appellants at 38. Even if the regulation 
could be read to change the definition, the Black Lung 
Benefits Act broadly invests the Secretary with authority not 
only to write regulations defining "total disability," 30 U.S.C. 
s 902(f)(1) - which in turn depends on the definition of 

pneumoconiosis - but also to supplement statutory terms "as 
[s]he deems necessary," id. s 932(a).

 NMA also argues that another part of the pneumoconiosis 
definition, section 718.201(c), defining pneumoconiosis as a 
"latent and progressive disease which may first become de-
tectable only after the cessation of coal mine dust exposure," 
lacks support in the administrative record and is thus arbi-
trary and capricious. In support of this argument, NMA 
points to record evidence indicating that pneumoconiosis is 
latent and progressive in - at most - eight percent of cases. 
See P.T. Donnan, et al., Progression of Simple Pneumoconio-
sis in Ex-Coalminers After Cessation of Exposure to Coal-
mine Dust iv (Inst. of Occupational Medicine, December 
1997). We would thus sustain NMA's challenge to section 
718.201(c) if the regulation said that pneumoconiosis is "al-
ways" or "typically" a latent and progressive disease. Al-
though the regulation could be so read - "pneumoconiosis is 
recognized as a latent and progressive disease" - the remain-
ing language provides that the disease "may first become 
detectable only after the cessation of coal mine dust expo-
sure." The Secretary resolved this ambiguity at oral argu-
ment. Asked whether her "position is [that the] regulation 
simply states [pneumoconiosis] can be a progressive and 
latent disease," counsel answered "that's correct." Tr. of 
Oral Arg. at 54. In light of this narrowing construction, we 
conclude that the record evidence of the disease's latency and 
progressivity - which also includes a study (not explicitly 
relied on by the government in its brief) indicating that 
pneumoconiosis is latent and progressive as much as 24% of 
the time, see 62 Fed. Reg. 3338, 3344 (Jan. 22, 1997) (citing 
studies) - is sufficient to support section 718.201(c).

 Change in Condition Rule

 Revised s 725.309(d) governs the circumstances under 
which miners may file a claim after denial of an earlier claim. 
The prior regulation allowed such claims only upon proof of 
"a material change in conditions," 20 C.F.R. s 725.309(d) 
(2000), while the revised regulation requires "the claimant [to] 
demonstrate[ ] that one of the applicable conditions of entitle-

ment has changed," 20 C.F.R. s 725.309(d) (2001). NMA's 
assertion that the revised rule is arbitrary and capricious 
because it "requires no exacting proof of materially changed 
conditions," Br. for Appellants at 40, and creates an "irrebutt-
able presumption" that a claimant has pneumoconiosis, id. at 
46, finds no support in the regulation's language. The re-
vised rule actually places the burden of proof squarely on the 
claimant to prove a change in condition, stating that "the 
claim shall be denied unless the claimant demonstrates that 
one of the applicable conditions of entitlement ... has 
changed." 20 C.F.R. s 725.309(d) (2001). Nor do we find 
convincing NMA's related argument that the revised regula-
tion "waives res judicata or traditional notions of finality," Br. 
for Appellants at 45, as the Secretary has interpreted the 
regulation to permit new claims based only on the claimant's 
current condition and to preclude the admission of any evi-
dence that existed at the time the previous claim was denied, 
see Br. for Appellees at 31.

 Treating Physician Rule

 A new rule, s 718.104(d) establishes that in determining 
whether a successful claimant's subsequent treatment for a 
pulmonary disorder is "compensable, the opinion of the min-
er's treating physician may be entitled to controlling weight." 
The rule is not mandatory. Instead, it permits ALJs to 
accord controlling weight to a treating physician's opinion if 
that opinion is "based on the credibility of the physician's 
opinion in light of its reasoning and documentation, other 
relevant evidence and the record as a whole." 20 C.F.R. 
s 718.104(d)(5).

 According to NMA, the revised rule impermissibly shifts 
the burden of proof from claimant to employer. In support of 
this argument, NMA relies on Greenwich Collieries, where 
the Supreme Court held that absent specific statutory autho-
rization, agencies may not informally create rules that sup-
plant the APA's requirement that "the proponent of a rule or 
order has the burden of proof." 512 U.S. at 269-71 (quoting 5 
U.S.C. s 556(d)). Greenwich Collieries, however, is inappli-
cable here, for neither the revised regulation's plain language 

nor the Secretary's interpretation, see Br. for Appellees at 38, 
relieves claimants of the burden of proving both pneumoconi-
osis and the credibility of the doctor's opinion. Indeed, the 
Secretary points out that this regulation does not even "ad-
dress which party bears the burden of proving the proposition 
to which the medical opinion evidence relates." Br. for 
Appellees at 38 (citing 65 Fed. Reg. at 79,933-34). Equally 
without merit is NMA's related argument that the treating 
physician rule is invalid because it "treats proof differently" 
by unfairly advantaging claimants' evidence; NMA even sug-
gests that the rule enables doctors to help claimants obtain 
benefits fraudulently by "exaggerating" the extent of claim-
ants' illnesses. Br. for Appellants at 34. This argument 
assumes that ALJs will automatically give controlling weight 
to treating physicians' opinions, yet the regulation actually 
places limits on their capacity to do so. See 20 C.F.R. 
s 718.104(d)(5) (permitting reliance on treating physician tes-
timony only where physician's opinion is credible and consis-
tent with record evidence). The requirement that a treating 
physician's opinion be credible, moreover, largely eliminates 
any risk of fraud.

 Arguing that the treating physician rule is also arbitrary 
and capricious, NMA claims that "[t]here is no scientific or 
medical reason to conclude that a treating physician has 
clearer insight into any medical question that might arise in a 
black lung claim than a pulmonary specialist or any other 
doctor." Br. for Appellants at 35. In support of this argu-
ment, NMA cites record evidence suggesting that "there is a 
significant likelihood that a treating physician will use decep-
tion to assist patients in obtaining third party paid benefits." 
Cmts. of the Nat'l Mining Ass'n at 44 (1/6/2000), reprinted at 
J.A. 2231. Yet the agency considered and rejected this 
allegation, convincingly pointing out that the claim could "as 
easily be directed toward any party-affiliated physician, or 
group of such physicians, who may benefit by tailoring conclu-
sions to fit the interests of the party paying for the medical 
opinion." 65 Fed. Reg. at 80,024; see also State Farm, 463 
U.S. at 51-54 (holding that an agency's duty of reasoned 

decisionmaking includes the requirement to explain away 
contrary evidence) and, e.g., id. at 52 ("Rescission of the 
[safety restraint] requirement would not be arbitrary and 
capricious merely because there was no evidence in direct 
support of the agency's conclusion.").

 Hastening Death Rule

 The Secretary revised s 718.205(c)(5) to state that "pneu-
moconiosis is a substantially contributing cause of a miner's 
death if it hastens the miner's death." Calling the rule 
arbitrary and capricious, NMA says "there is no science to 
support" a hastening death rule in the case of a death caused 
by a non-respiratory condition. Br. for Appellants at 50. 
The regulation, however, nowhere mandates the conclusion 
that pneumoconiosis be regarded as a hastening cause of 
death, but only describes circumstances under which a has-
tening-cause conclusion may be made. Moreover, it expressly 
requires claimants to prove that pneumoconiosis is the has-
tening cause. The fact that pneumoconiosis may, as NMA 
asserts, rarely or never hasten death primarily caused by 
other diseases does not undermine the regulation; it merely 
means that few or no claimants will succeed on the theory 
that black lung disease hastened death from other causes.

 In any event, the record contains medical testimony indi-
cating that "impairment of lung function from pneumoconiosis 
[can] weaken the body's defenses to infections and increase 
susceptibility to other disease processes." 65 Fed. Reg. at 
79,950 (discussing testimony of Dr. Robert Cohen, Chief of 
the Division of Pulmonary Medicine, Cook County (IL) Hospi-
tal). Although NMA cites two medical studies suggesting 
contrary conclusions, see J.A. 1167, 2468, the Secretary con-
sidered this evidence and gave plausible reasons for rejecting 
it, noting that both studies focused on the narrower medical 
definition of pneumoconiosis rather than the broader legal 
one, and that one of the studies concluded only that hastening 
death was rare but "did not rule it out as a medical possibili-
ty," 65 Fed. Reg. at 79,951. In light of all this, we think it 
obvious that the Secretary has successfully discharged her 
duty of reasoned decisionmaking.

 Operator Liability Rules

 Section 725.408 establishes a deadline for coal mine opera-
tors to submit evidence if they disagree with their designation 
as parties potentially liable for a miner's claim, while 
s 725.495(c) provides that once an operator has been deter-
mined to be responsible for a claim, that operator may be 
relieved of liability only if it proves both that it is financially 
incapable of assuming liability and that another operator that 
more recently employed the miner is financially capable of 
doing so. Again relying on Greenwich Collieries, NMA ar-
gues that the revised rules "relieve the agency of its normal 
burden to identify the correct responsible party" and shift 
that burden onto coal mine operators in violation of the APA's 
requirement that proponents of an order sustain the burden 
of proof. Br. for Appellants at 62. NMA misreads both 
revised regulations. Section 725.408 shifts the burden of 
production, not the burden of proof; it requires nothing more 
than that operators must submit evidence rebutting an asser-
tion of liability within a given period of time. Greenwich 
Collieries carefully distinguishes agency regulations that shift 
the burden of proof (prohibited by the APA "except as 
otherwise provided by statute," 5 U.S.C. s 556(d)) from regu-
lations that shift the burden of production (which the APA 
does not prohibit, see 512 U.S. at 270-80 (distinguishing 
burden of proof from burden of production)). NMA argues 
that s 725.495(c) nevertheless violates Greenwich Collieries 
because it "reliev[es] the agency of its natural burden of 
proving the identity of the correct responsible party." Br. for 
Appellants at 64. The regulation, however, shifts the burden 
of proof only to the "designated responsible operator," 20 
C.F.R. s 725.495(c); i.e., it applies only to the extent that a 
claimant has already carried his burden of proving that an 
operator is liable. "In seeking to be excused from liability," 
the District Court explained, "the operator becomes the 'pro-
ponent' of a remedial order of the ALJ and, therefore, the 
party to which [the APA] assigns the burden of proof." Nat'l 
Mining Ass'n v. Sec'y of Labor, No. 00-3086, slip op. at 52 
(D.D.C. Aug. 9, 2001); see also Greenwich Collieries, 512 U.S. 
at 278.

 NMA argues that s 725.495(c) is also arbitrary and capri-
cious because it rests on the premise that "employers and 
carriers are better situated to identify and prove an alterna-
tive liable party." Br. for Appellants at 64. As the Secretary 
points out, however, s 725.495(c) is not based on that pre-
sumption. See 65 Fed. Reg. at 80,008-09 (discussing 
s 725.495(c) but nowhere mentioning the rationale that mine 
operators and insurance carriers have superior access to 
information about miners' subsequent employment). Al-
though the Secretary offers little in the way of positive 
support for the rule, s 725.495(c) - an evidentiary rule - need 
only be "reasonable" and not "inconsistent with a federal 
statute" to survive review. Chem. Mfrs. Ass'n, 105 F.3d at 
706. Where, as here, the Secretary affords a mine operator 
liable for a claimant's black lung disease the opportunity to 
shift liability to another party, it is hardly irrational to 
require the operator to bear the burden of proving that the 
other party is in fact liable.

 Medical Benefits Rule

 The Secretary's revision of s 725.201(e) creates a presump-
tion that any pulmonary disorder for which a miner receives 
treatment after successfully filing a BLBA claim is caused by 
that miner's pneumoconiosis. The new regulation allows the 
operator to rebut this presumption with credible evidence 
that the disorder was not pulmonary, the disorder was unre-
lated to the miner's pneumoconiosis, or the treatment the 
miner received was unnecessary.

 Claiming that the medical benefits rule "shifts the burden 
to the employer to disprove medical coverage," Br. for Appel-
lants at 52, NMA argues it too runs afoul of Greenwich 
Colleries. Although the regulation could be so read, the 
Secretary explains that it shifts only the burden of produc-
tion to operators to produce evidence that the treated disease 
was unrelated to the miner's pneumoconiosis; the ultimate 
burden of proof remains on claimants at all times. See 65 
Fed. Reg. at 80,022 (explaining that "invocation" of the pre-
sumption "shifts only the burden of production, not persua-
sion"); see also Ling, 176 F.3d at 233-34 (holding that an 

identical "presumption merely reallocates the burden of pro-
duction, and does not affect the burden of proof"); Seals, 147 
F.3d at 512 (same).

 NMA argues that the medical benefits rule is also arbitrary 
and capricious, pointing to a comment claiming that "[w]hen a 
miner receives a medical service or supply for a pulmonary 
disorder, it is not reasonable to assume that the disorder is 
caused or aggravated by pneumoconiosis." Cmts. of Gregory 
J. Fino, M.D., and Barbara J. Bahl, Ph.D. at 11 (1/4/2000), 
reprinted at J.A. 2439. Carefully considering this comment, 
however, the Secretary rejected it because the comment 
failed to distinguish between medical pneumoconiosis and the 
much broader legal definition of the disease. See 65 Fed. 
Reg. at 80,023. As the Secretary points out, there is a clear 
rational relationship between the fact proved (that a miner 
suffered from totally disabling pneumoconiosis in the past) 
and the fact presumed (that the miner's treated pulmonary 
disorder is related to that pneumoconiosis); this suffices for 
purposes of our review.

 Total Disability Rule

 An entirely new provision, s 718.204(a) states that "any 
nonpulmonary or nonrespiratory condition or disease, which 
causes an independent disability unrelated to the miner's 
pulmonary or respiratory disability, shall not be considered" 
in determining a miner's total disability under the BLBA. 
According to NMA, the rule runs counter to the proposition 
that parties may submit all relevant evidence in support of 
their position. See 30 U.S.C. s 923(b). This argument, 
however, ignores the BLBA's clear grant of authority to the 
Secretary to establish the medical criteria for adequate proof 
of "total disability." Id. s 902(f)(1)(D). And contrary to 
NMA's claim that "DOL's rule excludes relevant evidence for 
no good reason," Br. for Appellants at 48, we see an obvious 
rational basis for the rule: the statute only pertains to 
whether a miner is disabled "due to pneumoconiosis," and 
evidence of nonpulmonary conditions has no relevance to that 
inquiry. Indeed, three circuits have adopted just this reading 
of the Act. See 65 Fed. Reg. at 79,947 (citing cases from 

Sixth, Seventh, and Tenth Circuits). But see Vigna, 22 F.3d 
at 1394-95.

 Challenging the total disability rule as arbitrary and capri-
cious, NMA claims that the regulation "is supported only by 
an intent to reverse" the Seventh Circuit's decision in Pea-
body Coal v. Vigna, which held that a miner totally disabled 
due to a nonpulmonary ailment could not be compensated 
under the Black Lung Benefits Act. See id. NMA's asser-
tion regarding intent is irrelevant: no authority supports the 
proposition that a rule is arbitrary and capricious merely 
because it abrogates a circuit court decision. Quite to the 
contrary, "regulations promulgated to clarify disputed inter-
pretations of a regulation are to be encouraged. Tidying-up a 
conflict in the circuits with a clarifying regulation permits a 
nationally uniform rule without the need for the Supreme 
Court to essay the meaning of every debatable regulation." 
Pope v. Shalala, 998 F.2d 473, 486 (7th Cir. 1999) (citation 
and internal quotation marks omitted).

 NMA also claims that the total disability rule "is contrary 
to all of the medical testimony," Br. for Appellants at 49, but 
points only to record evidence generally indicating that evi-
dentiary restrictions are "inconsistent with good medical 
practice," Cmts. of Drs. Fino and Bahl at 4, reprinted in J.A. 
2432, evidence far too vague to supply any basis for conclud-
ing that the total disability rule is arbitrary and capricious. 
The revised regulation has a rational basis and is consistent 
with the APA; that is enough.

 Evidence Limitation Rules

 NMA next argues that nothing in the APA authorizes the 
revised regulations (ss 725.310(b), 725.414, 725.456, 
725.457(d), and 725.458) setting limits on the amount and 
timing of evidence admissible in benefits determinations, be-
cause that statute "authorizes each party to submit whatever 
evidence that party thinks is needed to prove its case or 
defense." Br. for Appellants at 56. NMA's theory - that the 
APA permits introduction of unlimited amounts of evidence - 
is flatly contradicted by the statute itself, which empowers 
agencies to "exclu[de] ... irrelevant, immaterial, or unduly 

repetitious evidence" as "a matter of policy," 5 U.S.C. 
s 556(d), as well as the Black Lung Benefits Act, which 
authorizes the Secretary to issue regulations "provid[ing] for 
the nature and extent of the proofs and evidence and the 
method of taking and furnishing the same in order to estab-
lish the rights to benefits," 30 U.S.C. s 923(b) (incorporating 
42 U.S.C. s 405(a)). Nor do the revised rules set inflexible 
limits, as NMA claims. On the contrary, the rules give ALJs 
discretion to hear additional evidence for "good cause," 20 
C.F.R. s 725.456(b)(1).

 NMA claims that the evidence-limiting rules are also arbi-
trary and capricious because they are unsupported by medical 
evidence. NMA bases this claim on a commenter's argument 
that "it is unreasonable to artificially limit" the amount of 
evidence heard in benefits determinations. Cmts. of Drs. 
Fino and Bahl at 4, reprinted in J.A. 2432. Other record 
evidence, however, indicates that the new evidentiary limits 
are not at all "artificial[ ]," but - as the Secretary explained - 
will enable ALJs to focus their attention "on the quality of the 
medical evidence in the record before [them]." 64 Fed. Reg. 
at 54,994. The record also makes clear the need for evidence 
limitations; in their absence, lawyers often waste ALJs' time 
and resources with excessive evidence - in one case, a mine 
operator's lawyer submitted eighty-nine separate X-ray re-
readings from fourteen different experts. Cmts. of Robert 
Cohen at 71 (6/19/1997), reprinted in J.A. 1381. At oral 
argument, moreover, NMA conceded that ALJs have always 
had discretion to exclude evidence in precisely the manner 
outlined by the new evidence-limiting rules; it would be 
strange indeed to conclude that the Secretary acted arbitrari-
ly and capriciously by codifying evidentiary limits that ALJs 
have always had the discretion to impose.

 Dependency Rules

 The Black Lung Benefits Act incorporates the Social Secu-
rity Act's definition of "dependent." See 30 U.S.C. s 902(a) 
(incorporating the Social Security Act's definition of "depen-
dents"). These regulations (ss 725.204, 725.213(c), 725.214, 
725.219(d)) broaden the definition of "dependent" to track 

more closely recent revisions of the incorporated Social Secu-
rity Act provisions. Like the District Court, though, we 
decline to consider this claim, because NMA failed to raise it 
during the notice-and-comment period. See, e.g., Nat'l Wild-
life Fed'n v. EPA, 286 F.3d 554, 562 (D.C. Cir. 2002) ("It is 
well established that issues not raised in comments before the 
agency are waived and this Court will not consider them."). 
NMA points out that it argued before the agency that "Con-
gress did not intend to treat the black lung program as a 
social safety net," Br. for Appellants at 69, but this general 
claim falls well short of providing the agency with the re-
quired "adequate notice" of NMA's specific claim. Nat'l 
Recycling Coalition, Inc. v. Reilly, 884 F.2d 1431, 1437 (D.C. 
Cir. 1989). Contrary to NMA's argument, moreover, this 
notice requirement is not undermined by Darby v. Cisneros, 
509 U.S. 137 (1993), and Sims v. Apfel, 530 U.S. 103 (2000). 
As we recently noted, Darby "addresses exhaustion of reme-
dies, not waiver of claims, and is thus wholly inapposite" to 
the latter issue. Nat'l Wildlife Fed'n, 286 F.3d at 562. Sims 
is equally inapplicable, for it addresses issue exhaustion, not 
issue waiver.

 Attorney's Fee Rule

 Section 725.366(b) provides that in calculating attorney's 
fees that are shifted from claimant to mine operator, the ALJ 
"shall take into account" a number of factors, including "the 
quality of the representation, the qualifications of the repre-
sentative, [and] the complexity of the legal issues involved." 
In Burlington v. Dague, the Supreme Court held that shifted 
attorney's fees must be calculated according to the "lodestar 
method," which requires that such fees be determined by 
multiplying reasonable time spent by the attorney's hourly 
fee. See 505 U.S. 557, 562 (1992). Although the revised 
regulation requires consideration of no factors not already 
included in the lodestar analysis, NMA argues that the rule 
will require ALJs to consider some factors more than once, 
resulting in prohibited "double counting." Br. for Appellants 
at 67; see Pennsylvania v. Delaware Valley City Council, 483 
U.S. 711, 726 (1987). Not only does nothing in the revised 
regulation require such double counting, but the Secretary 

interprets the regulation to mean that "the factors identified 
in s 725.366(b) do not supplant the 'lodestar' method of 
calculating reasonable fees, or enhance the lodestar fee once 
it is calculated." Br. for Appellees at 54.

 Cost and Expense Rules

 Section 725.101(a)(6) (the cost rule) expands the definition 
of BLBA "benefits" to include "any expenses related to the 
medical authorization." As a result, employers now bear the 
costs of successful claimants' medical examinations. Section 
725.459 (the expense rule) empowers ALJs in their discretion 
to shift costs incurred by claimants' production of witnesses 
to an employer, regardless of which party prevails.

 NMA rests its challenge to these regulations on the twin 
premises that parties presumptively bear the costs of their 
own litigation expenditures and that such costs may only be 
shifted to the losing party pursuant to "specific statutory 
authorization." See W. Va. Univ. Hosp. v. Casey, 499 U.S. 83, 
97-100 (1991). The cost rule, however, finds just such "specif-
ic statutory authorization" in the Black Lung Benefits Act's 
express authorization to "[t]he Secretary ... to charge the 
cost of examination ... to the employer." 33 U.S.C. s 907(e).

 In support of the expense rule, the Secretary first cites 33 
U.S.C. s 928(d), which permits her to shift attorney's fees. 
But that section of the Act authorizes fee-shifting only when 
the claimant prevails, while the expense rule authorizes such 
shifting for both successful and unsuccessful claimants. Nor 
does 30 U.S.C. s 907(e) provide an adequate source of author-
ity; that clause only permits the Secretary to assign costs of 
a single pulmonary examination - not any cost associated with 
claimants' witnesses - to the employer. The expense rule 
thus lacks the "specific statutory authorization" for fee-
shifting required by Casey and is the one regulation that we 
find invalid on its face.

 III. Conclusion

 For the foregoing reasons, we affirm in part, reverse in 
part, and remand to the District Court for further instruc-
tions consistent with this opinion.