

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-24-1995

# OWCP v Eastern Assoc Coal Corp

Precedential or Non-Precedential:

Docket 94-3254

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"OWCP v Eastern Assoc Coal Corp" (1995). *1995 Decisions.* Paper 107.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/107

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

—————————————

No. 94-3254

—————————————

DIRECTOR, OFFICE OF WORKERS' COMPENSATION
PROGRAMS, UNITED STATES DEPARTMENT OF LABOR,

Petitioner

v.

EASTERN ASSOCIATED COAL CORPORATION;
VIOLET M. O'BROCKTA; UNDERKOFFLER COAL;
BENJAMIN STINNER

—————————————

On Appeal for Review of Orders of the Benefits
Review Board, United States Department of Labor
(BRB No. 88-2643 BLA)

—————————————

Argued February 16, 1995

Before:   STAPELTON and COWEN, <u>Circuit Judges</u>,
          and HUYETT, <u>District Judge</u>[*]

(Filed April 24, 1995)

Thomas S. Williamson, Jr., Solicitor of Labor
Donald S. Shire, Associate Solicitor
Christian P. Barber, Counsel for Appellate Litigation
Dorothy L. Page, Attorney
Edward Waldman (argued)
U.S. Department of Labor
Office of the Solicitor
Suite N-2605
Frances Perkins Building
200 Constitution Avenue, N.W.
Washington, D.C. 20210

          Counsel for Petitioner
          Director, Office of Workers' Compensation Programs

—————————————————

[*]  Honorable Daniel H. Huyett, 3rd, United States District Judge
for the Eastern District of Pennsylvania, sitting by designation.

Mark E. Solomons (argued)
Laura Metcoff Klaus
Arter & Hadden
Suite 400K
1801 K Street, N.W.
Washington, D.C. 20006

       Counsel for Respondent
       Eastern Associated Coal Corporation

Paul K. Paterson
Mascelli, Walsh & Paterson
148 Adams Avenue
Scranton, Pennsylvania 18503

       Counsel for Respondent
       Underkoffler Coal Service

Andrew C. Onwudinjo
Krasno, Krasno & Quinn
400 North Second Street
Pottsville Law Building
Pottsville, PA  17901

       Counsel for Respondent
       Benjamin Stinner

---

OPINION OF THE COURT

---

Huyett, District Judge:

The Black Lung Benefits Act ("BLBA" or "Act"), 30 U.S.C. §§ 901-945, establishes a comprehensive scheme to compensate coal miners and their surviving dependents for medical problems and disabilities caused by pneumoconiosis, also known as black lung disease. 30 U.S.C. § 901(a); BethEnergy Mines, Inc. v. Director, OWCP, 32 F.3d 843, 845 (3d Cir. 1994). Pursuant to section 422(g) of the Act, 30 U.S.C. § 932(g), the amount of benefits payable must be reduced by the amount of compensation

received under a federal or state workers' compensation law because of death or disability caused by pneumoconiosis.

In the matter before us, we are presented with a conflict between the Director, Office of Workers' Compensation Programs ("Director") of the Department of Labor ("DOL"), and the Benefits Review Board ("Board") of DOL over this offset provision. Rejecting the Director's position, the Board determined that employers paying federal black lung benefits should offset their payments by the amount of state benefits the miners received from the Commonwealth pursuant to section 301(i) of the Pennsylvania Occupational Disease Act. We must decide whether to defer to the Director's policy that compensation from Pennsylvania general revenues pursuant to section 301(i) of the Pennsylvania Occupational Disease Act does not reduce the miner's entitlement to federal benefits. Although we disagree with the Board's conclusion that Congress's intent is clear from the statute, we conclude that the Director's interpretation of the pertinent federal regulations is plainly erroneous and inconsistent with the regulations. We deny the Director's petition for review.

## I. Regulatory Structure

### A. Federal Black Lung Benefits Program

Prior cases have reviewed the legislative history of the Black Lung Benefits Act. See, e.g., Elliot Coal Mining Co. v. Director, OWCP, 17 F.3d 616, 627–28 (3d Cir. 1994); Helen Mining Co. v. Director, OWCP, 924 F.2d 1269, 1271–73 (3d Cir. 1991). We set forth only those portions that are essential to an

understanding of this case.  Originally promulgated in 1969 as part of the Federal Coal Mine Health and Safety Act of 1969, Pub. L. No. 91-173, 83 Stat. 792 (1969) (codified at 30 U.S.C. §§ 901-945), Congress has amended the Black Lung Benefits Act several times.  See, e.g., Black Lung Benefits Act of 1972, Pub. L. No. 92-303, 86 Stat. 150 (1972); Black Lung Benefits Reform Act of 1977, Pub. L. No. 95-239, 92 Stat. 95 (1978); Black Lung Benefits Amendments of 1981, Pub. L. No. 97-119, 95 Stat. 1635 (1981) (all codified at 30 U.S.C. §§ 901-945).

Claims for benefits under the Black Lung Benefits Act are either "Part B," "transition period," or "Part C" claims. Part B governs all claims filed before June 30, 1973.  See 30 U.S.C. §§ 921-925.  Part B claims were filed with and adjudicated by the Secretary of Health and Human Services, Social Security Administration ("SSA").  Claims that were filed from July 1, 1973 through December 31, 1973 are "transition period" claims.  30 U.S.C. § 925.[1]  Congress created the transition period to facilitate the transfer of the primary responsibility for processing and adjudicating claims from the SSA to the DOL.  The federal treasury was responsible to pay benefits until January 1, 1974.  30 U.S.C. § 925(a).  At that time, coal mine operators who had been notified of pending black lung claims were to assume liability for the payment of benefits.  30 U.S.C. § 925.

Part C, 30 U.S.C. §§ 932-945, which governs all claims filed after January 1, 1974, applies to the matter before us.

_____

[1].  Technically, these claims are considered Part B claims.

Although DOL administers these claims, Part C establishes an employer-funded federal workers' compensation program in cooperation with the states to provide benefits to coal mine workers for total disability or death due to pneumoconiosis. A coal tax funded Black Lung Disability Trust Fund ("Fund") pays interim benefits when a designated responsible coal mine operator fails to commence payment within thirty days after the initial determination of eligibility by the deputy commissioner. 26 U.S.C. § 9501(d)(1); 20 C.F.R. § 725.522(b). If an administrative law judge, the Board, or a court later determines that the recipient was entitled to the amount paid from the Fund and that the operator was liable, the responsible operator must repay the Fund. 30 U.S.C. § 934(b)(1); 20 C.F.R. § 725.602.

Congress designed section 422(g) of the BLBA to prevent Part C claimants from receiving duplicative black lung benefits. Director, OWCP v. Barnes & Tucker Co., 969 F.2d 1524, 1526 (3d Cir. 1992). Section 422(g) provides in pertinent part:

> The amount of benefits payable under this section shall be reduced, on a monthly or other appropriate basis, by the amount of any compensation received under or pursuant to any Federal or State workmen's compensation law because of death or disability due to pneumoconiosis.

30 U.S.C. § 932(g). A provision is also designed to prevent double recovery in Part B claims. Although not directly applicable to the matter before us, it is useful to compare it with section 422(g). Section 412(b) reads in pertinent part:

> [B]enefit payments under this section to a miner, or his widow, child, parent, brother, or sister shall be reduced, on a monthly or

other appropriate basis, by an amount equal to any payment received by such miner or his widow, child, parent, brother, or sister under the workmen's compensation, unemployment compensation, or disability insurance laws of his State on account of the disability of such miner due to pneumoconiosis, and the amount by which such payments would be reduced on account of excess earnings of such miner under section 203(b) through (*l*) of the Social Security Act, if the amount paid were a benefit payable under section 202 of such Act.

30 U.S.C. § 922(a).

B.  Pennsylvania Occupational Disease Act

In the two cases consolidated before the Board, miners George O'Brockta and Benjamin Stinner both received benefits pursuant to the Pennsylvania Occupational Disease Act, 77 Pa. Cons. Stat. Ann. §§ 1201–1603, because of pneumoconiosis. Section 301(i) of the Pennsylvania Occupational Disease Act, states in pertinent part as follows:

Notwithstanding any other provisions of this act, compensation for silicosis, anthraco-silicosis, coal worker's pneumoconiosis, and asbestosis shall be paid for each month beginning with the month this amending act becomes effective, or beginning with the first month of disability, whichever occurs later, at the rate of seventy-five dollars ($75) per month, to every employe totally disabled thereby as a result of exposure thereto, who has not theretofore been compensated because his claim was barred by any of the time limitations prescribed by this act, and shall continue during the period of such total disability.

77 Pa. Cons. Stat. Ann. § 1401(i).

The source of the compensation depends on the miner's situation. Generally, Pennsylvania pays forty percent of the liability

imposed under the Occupational Disease Act and a responsible employer pays sixty percent. 77 Pa. Cons. Stat. Ann. § 1408(a). The Commonwealth, however, pays all compensation if it is not conclusively proven that the miner's disability arose out of employment with his last employer, 77 Pa. Cons. Stat. Ann. § 1401(g), or if a miner's last exposure preceded December 1, 1965, 77 Pa. Cons. Stat. Ann. § 1401(i). When a claimant receives benefits pursuant to the federal statute, Pennsylvania law requires the state to suspend compensation from the general revenues of the Commonwealth.[2] 77 Pa. Cons. Stat. Ann. § 1401(k).

---

[2]. The pertinent part of the Pennsylvania Occupational Disease Act reads as follows:

> Upon the award of any benefits under the Federal Coal Mine Health and Safety Act of 1969 to a person who is also receiving or claiming monthly compensation totally funded by general revenues of the Commonwealth of Pennsylvania under subsections (a), (i), (j) or (l) of section 301, such person shall have his monthly compensation from general revenues of the Commonwealth suspended effective with the month following the month of award of Federal benefits . . . . Upon any future action by the United States Congress, Federal executive departments, or Federal courts which would make present recipients under the Pennsylvania Occupational Disease Act eligible for both Federal and State payments, the sum of which would exceed the maximum authorized Federal payment, the eligible recipients would then receive retroactively all State payments that were suspended under the authority of this act. All such recipients who have their State payments suspended shall continue their eligibility and entitlement under the Pennsylvania Occupational Disease Act and at any time in the future for whatever reason that such recipients' payments under the Federal law are terminated, suspended or reduced their State payments shall be reinstituted effective with the month following the month that Federal benefits are terminated, suspended or reduced.

## II.  Facts and Procedural History

We review two cases consolidated before the Benefits Review Board on appeal.  George O'Brockta ("O'Brockta") filed an application for federal black lung benefits on December 2, 1976.  See J.A. at 64 (ALJ Decision and Order – Award of Benefits, Dec. 9, 1983).  Respondent Eastern Associated Coal Corporation ("Eastern") controverted its designation as responsible operator, and the DOL initiated the payment of interim benefits from the Fund.  While this application was pending, a Pennsylvania Bureau of Workers' Compensation Referee directed the Pennsylvania Department of Labor and Industry to compensate O'Brockta at the rate of $125.00 per month beginning July 9, 1979, pursuant to section 301(i) of the Pennsylvania Occupational Disease Act.  J.A. at 73-74 (Referee's Decision, Jan. 11, 1980).  O'Brockta eventually collected $1,750.00 from Pennsylvania for the period July 9, 1979 to September 23, 1980.  Pursuant to a West Virginia occupational disease act, he collected $10,756.73 for the period November 21, 1976 to June 4, 1978.

O'Brockta's widow later filed a survivor's claim on September 24, 1980.  An administrative law judge ordered Eastern to pay Mrs. O'Brockta for benefits to which she was entitled commencing in December 1976.  J.A. at 54 (Decision and Order -- Awarding Benefits, Feb. 25, 1986).  On a motion for reconsideration, the administrative law judge ordered Eastern to

(..continued)
77 Pa. Cons. Stat. Ann. § 1401(k).

"reimburse the Secretary of Labor for any payments made to the claimant less the appropriate offsets for state workmen's compensation benefits" and to deduct such amounts, as appropriate, from the amounts it was required to pay Mrs. O'Brockta. J.A. at 51-53 (Order Granting Employer's Motion for Reconsideration and Amending the Decision and Order Awarding Benefits, April 3, 1986). The administrative law judge considering the Director's Motion for Reconsideration rejected the Director's argument that although the award properly offset payments made pursuant to the West Virginia statute, payments derived from Pennsylvania general revenues were not pursuant to a workers' compensation law. J.A. at 46-49 (Order Denying Motion for Clarification, May 19, 1988).

Benjamin Stinner ("Stinner") filed his claim for benefits pursuant to section 301(i) of the Pennsylvania Occupational Disease Act on September 27, 1978. On October 4, 1979, a state referee directed the Pennsylvania Department of Labor and Industry to pay him $125 per month commencing August 3, 1979. J.A. at 76-78 (Referee's Decision, Oct. 4, 1979). He eventually received $2000 pursuant to this program. He subsequently filed for benefits pursuant to the BLBA on January 9, 1980. After designated responsible operator Underkoffler Coal Service ("Underkoffler") refused to pay benefits to Stinner, DOL initiated interim payments from the Fund on April 8, 1981. On December 9, 1983, pursuant to the BLBA, an administrative law judge ordered benefits to commence as of January 1980. J.A. at 64-72 (Decision and Order - Award of Benefits, Dec. 9, 1983).

Underkoffler repaid the Department of Labor for the interim benefits except $2000, the amount of benefits Stinner received pursuant to the Pennsylvania program. The administrative law judge considering this issue refused to order Underkoffler to repay this money. J.A. at 39-42 (Decision and Order - Denying Additional Reimbursement of Medical Benefits, June 27, 1988). These two cases were consolidated for appeal to the Board.

On appeal, the Board rejected the Director's contention that payments made to O'Brockta and Stinner pursuant to the Pennsylvania Occupational Disease Act did not reduce the amount of federal benefits that responsible operators must reimburse the Fund. The Board found the statutory language of section 422(g) clear and unambiguous, and it refused to consider the legislative history as an aid to its construction of the statute. J.A. at 17-25 (Decision and Order of the Benefits Review Board, March 22, 1994).

The Director now petitions for review. We have jurisdiction over this appeal from the final order of the Benefits Review Board pursuant to section 422(a) of the Black Lung Benefits Act, 30 U.S.C. § 932(a), which incorporates section 21(c) of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 921(c).[3]

---

[3]. The Supreme Court recently considered the Director's standing to pursue appeals in Director, OWCP v. Newport News Shipbuilding & Dry Dock Co., ___ U.S. ___, ___ S. Ct. ____, ___ L. Ed.2d ___, No. 93-1783, 1995 WL 115726 (March 21, 1995). The Supreme Court held that the Director does not have standing to sue pursuant to § 921(c) of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 921(c), to seek judicial review of decisions by the Benefits Review Board that in the Director's view, deny claimants

III. Discussion

A. Standard of Review

When we review the decisions of the Board for error of law, our review is plenary. Director, OWCP v. Barnes & Tucker Co., 969 F.2d 1524, 1527 (3d Cir. 1992); Hillibush v. United States Dep't of Labor, Benefits Review Bd., 853 F.2d 197, 202 (3d Cir. 1988). The principals of deference articulated in Chevron, U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S. Ct. 2278, 81 L. Ed.2d 694 (1984), however, guide our construction of the BLBA. See also Elliot Coal Mining Co. v. Director, OWCP, 17 F.3d 616 (3d Cir. 1994).

When we review an agency's construction of a statute, if the intent of Congress is clear, we must give effect to that intent. Chevron, 467 U.S. at 842–43, 104 S. Ct. at 2781–82. If the statute is silent or ambiguous with respect to a particular issue, then we must defer to the agency's regulation if it is based on a reasonable construction of the statute. Id. When

(..continued)
compensation to which they are entitled. This decision does not affect this appeal, however, because Congress explicitly designated the Secretary of Labor as a party in any proceeding relative to a claim for black lung benefits. 30 U.S.C. § 932(k). See id. (Ginsburg, J., concurring). Furthermore, the Board decision adversely affected DOL's ability to recover payments from the Fund and thus implicates the Director's pecuniary interest, making him an aggrieved party under the teachings of Krolick Contracting Corp. v. Benefits Review Board, 558 F.2d 685, 689 (3d Cir. 1977), and its progeny. See Director, OWCP v. Rochester & Pittsburgh Coal Co., 678 F.2d 17 (3d Cir. 1982); accord Director, OWCP v. Alabama By-Products Corp., 560 F.2d 710, 716–17 (5th Cir. 1977); cf. Newport News Shipbuilding, 1995 WL 115726 at *2 n.1 (noting that the issue of the Director's standing as administrator of a LHWCA Fund was not before the court).

considering whether the regulation complies with Congress's mandate:

> [W]e look to see whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose. . . . So long as the regulation bears a fair relationship to the language of the statute, reflects the views of those who sought its enactment, and matches the purpose they articulated, it will merit deference.

Sekula v. FDIC, 39 F.3d 448, 452 (3d Cir. 1994).

We must also "defer to an agency's consistent interpretation of its own regulation unless it is 'plainly erroneous or inconsistent with the regulation.'" Director, OWCP v. Mangifest, 826 F.2d 1318, 1323 (3d Cir. 1987) (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S. Ct. 1215, 1217, 89 L. Ed. 1700 (1945)); Sekula v. FDIC, 39 F.3d at 453. We accord greater deference to an administrative agency's interpretation of its own regulations than to its interpretation of a statute. Facciano Constr. Co. v. United States Dep't of Labor, 987 F.2d 206, 213 (3d Cir.), cert. denied, ___ U.S. ___, 114 S. Ct. 80, 126 L. Ed.2d 48 (1993). See also Martin v. Occupational Safety & Health Review Comm'n, 499 U.S. 144, 150, 111 S. Ct. 1171, 1175, 113 L. Ed.2d 117 (1991); Lyng v. Payne, 476 U.S. 926, 939, 106 S. Ct. 2333, 2341, 90 L. Ed.2d 921 (1986) ("an agency's construction of its own regulations is entitled to substantial deference"). This deference, however, does not permit us to defer to an "interpretation in an adversary proceeding that strains the plain and natural meaning of the words." Bethlehem Steel Corp. v. Occupational Safety & Health

Review Comm'n, 573 F.2d 157, 161 (3d Cir. 1978); Mangifest, 826

F.2d at 1324.  As we have said before:

> The responsibility to promulgate clear and
> unambiguous standards is upon the Secretary.
> The test is not what he might possibly have
> intended, but what he said.  If the language
> is faulty, the Secretary has the means and
> the obligation to amend.

Bethlehem Steel v. OSHRC, 573 F.2d at 161.  Thus, any deference

also is "tempered by our duty to independently insure that the

agency's interpretation comports with the language it has

adopted."  Director, OWCP v. Gardner, 882 F.2d 67, 70 (3d Cir.

1989).  See also Sekula v. FDIC, 39 F.3d at 453; Barnes & Tucker

Co., 969 F.2d at 1527.

In addition, we give judicial deference to the

Director, as policymaker, rather than to the Board, which is

purely an adjudicator.  Elliot Coal Mining Co., 17 F.3d at 626–

27; Barnes & Tucker Co., 969 F.2d at 1527; Gardner, 883 F.2d at

70.  When the Director and the Secretary advance conflicting

interpretations of the statute, the Secretary's interpretation

prevails over the Director's because the Director is a mere

delegatee of the Secretary.  Elliot Coal Mining Co., 17 F.3d at

627.  As a result, when a regulation is clear on its face, the

regulation may not be subject to an alternative construction by

the Director.  Gardner, 882 F.2d at 68.

B.  Interpretation of the Regulations

We agree with the Director that the statute is

ambiguous.  The statute requires an offset "by the amount of any

compensation received under or pursuant to any Federal or State

workmen's compensation law because of death or disability due to pneumoconiosis."  30 U.S.C. § 932(g).  Congress's intent as to the meaning of "workers' compensation law" is not clear from the text of the statute alone.  The statute fails to define the meaning of worker's compensation, nor is its meaning apparent from the text.  As did the Board, we consider the definition of "workmen's compensation" as provided in Larson's Workmen's Compensation.  It defines workmen's compensation as follows:

> Workmen's compensation is a mechanism providing cash-wage benefits and medical care to victims of work-connected injuries, and for placing the cost of these injuries ultimately on the consumer, through the medium of insurance, whose premiums are passed on in the cost of the product.

1 Arthur Larson, The Law of Workmen's Compensation, § 1.00 (1994).  The Director points out that in certain situations, section 301(i) of the Pennsylvania Occupational Disease Act places the cost on the public fisc, rather than by using insurance, and that the amount of the Pennsylvania payments bear no relation to the miner's wages.  We agree that the text of the statute is ambiguous with respect to whether section 301(i) of the Pennsylvania Occupational Disease Act was excluded from the term "workman's compensation laws."  Therefore, the Board erred in concluding that the text was clear, and we must consider whether the Secretary's regulation and the Director's interpretation comport with the statute.

We consider two regulations.  The regulation implementing section 422(g) states as follows:

> With respect to any benefits payable for all periods of eligibility after January 1, 1974, a reduction of the amount of benefits payable shall be required on account of:
>
> (1) Any compensation or benefits received under any State workers' compensation law because of death or partial or total disability due to pneumoconiosis . . . .

20 C.F.R. § 725.533(a)(1). The regulations define a "workers' compensation law" for the purposes of Part C as follows:

> For the purposes of this subchapter, except where the content clearly indicates otherwise, the following definitions apply: . . . (4) A "workers' compensation law" means a law **providing for payment of benefits to employees**, and their dependents and survivors, for disability on account of injury, including occupational disease, or death, suffered in connection with their employment.

20 C.F.R. § 725.101(a)(4) (emphasis added). These regulations comport with the language of the statute and with Congress's apparent intent. The regulations fail to suggest that when a law authorizes benefits to employees solely from general revenues, it is not a workers' compensation statute. In fact, the text of the regulation does not suggest that the source of funding of the law plays any role in its determination as a workers' compensation law.

The Director, however, argues that we should defer to her interpretation that the phrase "payment of benefits to employees" actually means "payment of benefits by employers to employees." She offers several reasons for her interpretation of the regulation. First, a now repealed regulation defined

"workers' compensation law" exactly as the Director seeks to interpret the current regulation. The Director argues that prior to 1978, Part C regulations defined "workmen's compensation law" as follows:

> A "workmen's compensation law" means a law providing for payment of compensation **by employers to employees** (and their dependents) for injury (including occupational disease), or death suffered in connection with their employment.

20 C.F.R. § 715.101(a)(18) (1977) (repealed) (emphasis added). The Director argues that Congress never amended the statute to change the definition of "workers' compensation law" and that there is no record that the Director intended to change her policy of not reducing federal black lung benefits by the amount of compensation received solely from Pennsylvania general revenues under section 301(i). The issue however, is what the Secretary said through regulation, not what the Secretary might have intended. Bethlehem Steel Corp. v. OSHRC, 573 F.2d 157, 161 (3d Cir. 1978). Thus, if anything, this older regulation provides further proof that the current regulations do not exclude laws that provide for payments from a state's general revenues from the definition of "workers' compensation laws." Regulations in Part B provide further support that the Director's interpretation of the regulations is inconsistent with the text of the regulation. Part B regulations explicitly define "workmen's compensation law" to exclude statutes funded by general revenues. Section 410.110(p) provides as follows:

> A "workmen's compensation law" means a law providing for payment of compensation to

an employee (and his dependents) for injury (including occupational disease) or death suffered in connection with his employment. **A payment funded wholly out of general revenues and paid (without regard to insurance principles) solely on account of the financial need of the miner and his family, shall not be considered a payment under a "workmen's compensation law."**

20 C.F.R. § 410.110(p) (emphasis added). Although the Director argues that DOL looked to the SSA's interpretation of the BLBA in writing the regulations, the SSA regulations are much different than the DOL regulations. This regulation reinforces the impression that the Director must comply with the text of the regulation rather than with what the Secretary may have intended section 725.101(a)(4) to mean.

Second, the Director argues that if the words "to employees" are read without inferring the words "by employers" the word "to employees" loses its specific meaning and the more general word "individuals" could be substituted instead. Director's Br. at 29. This interpretation in not evident from the text of the regulation. The BLBA only provides benefits to injured employees and their dependents. Some other "individual" who receives compensation pursuant to some state statute, would never be seeking benefits pursuant to the BLBA. The Director's interpretation adds words that are not in the text and are not evident from a plain and natural reading of the statute.

Third, the Director argues that the Board's decision confers a windfall on the employers. We agree with the Director that pursuant to the Board's decision, the Respondents' total

liability is less than it would have been had there been no state award. This policy concern, however, is one the Secretary must address through rewriting the regulations rather than through interpretation.

Finally, the Director argues that the "the Black Lung Benefits Act is remedial legislation that ought to be liberally construed, so long as such a construction would not be plainly erroneous or inconsistent with the language of the Act." Director's Br. at 31. While the Director's interpretation is not inconsistent with the statute, it is inconsistent with the statute's implementing regulations, even according substantial deference to the Director. Therefore, we cannot defer to this interpretation.

Although the Director claims that she consistently has applied the same policy for twenty years, she is not permitted to imply language that simply does not exist. Director, OWCP v. Mangifest, 826 F.2d 1318, 1324 (3d Cir. 1987). Absent from the text of the regulation is any suggestion that the funding source of a state statute determines its status as a workers' compensation statute. Her interpretation strains the "plain and natural meaning" of the text. To reach such a result would require consideration of factors far beyond the actual regulation.

On the other hand, we also reject the Board's argument that we must accord deference to Pennsylvania's interpretation of section 422(g) of the BLBA. We defer only to the interpretations offered by the agency charged with administering the law. Thus,

the fact that section 301 of the Pennsylvania Occupational Disease Act is in Title 77, entitled "Workmen's Compensation," does not influence our decision, nor does the fact that the referee who awarded O'Brockta and Stinner benefits was a Workmen's Compensation Referee for the Commonwealth's Bureau of Workers' Compensation. To hold otherwise would permit the state, rather than the federal government to administer the laws. Thus, we must reject the Board's reasoning that the plain meaning of section 422(g) is that when a state has denominated a law as a workers' compensation law, benefits paid pursuant to it are subject to offset. We reiterate that we cannot accord more deference to the Director's interpretation of the regulation than to the actual regulation.

The Director points to a single segment of the legislative history that support her interpretation, but we find her reference unhelpful.[4] Congress delegated the Secretary the

---

[4]. During floor debate in 1969, Representative Dent, congressman from Pennsylvania who was the floor manager of the Bill, stated that the offset provisions of §§ 412(b) and 422(g) did not apply to state programs funded through general revenues. He cited the Pennsylvania program that paid benefits out of general revenues as an example of a program that was not a "workmen's compensation" program within the meaning of the Act. 115 Cong. Rec. 39713 (1969). This isolated floor comment would have provided some support for the Director's position had the Secretary interpreted the provisions of the Act relating to Part C in the same manner as the Social Security Administration interpreted the provisions relating to Part B when it promulgated § 410.110(p) of its regulations. However, the Secretary, whom we believe from the context must have been acting advertently, adopted a regulation regarding Part C claims with a text markedly different from the text of § 410.110(p). Congressman Dent's comment would not justify our reading the Secretary's regulation concerning Part C claims in a manner inconsistent with its text.

responsibility to fill in the gaps left in the BLBA. If DOL intends to make an exception for state statutes that are funded solely through a state's general revenues, it has the means and obligation to amend its regulations to provide for this exception. The Director's interpretation does not comport with the language of the regulations.

## IV. Conclusion

In conclusion, we hold that the agency's regulations defining workmen's or workers' compensation laws are a reasonable construction of the statute, the regulations are not ambiguous, and the Director's interpretation of the regulations are inconsistent with the regulation, therefore, we do not defer to the Director's interpretation. Although we disagree with the Board that Congress's intent is plain from the statutory language, we hold that because the Director's interpretation of the regulations are inconsistent with the Secretary's regulations, the Board's order should be affirmed.

For the foregoing reasons, we deny the petition for review and affirm the order of the Benefits Review Board.