

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-13-2006

# DE River Stevedores v. DiFidelto

Precedential or Non-Precedential: Precedential

Docket No. 04-4531

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"DE River Stevedores v. DiFidelto" (2006). *2006 Decisions.* Paper 1346.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1346

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 04-4531

_____


DELAWARE RIVER STEVEDORES;
LIBERTY MUTUAL INS. CO.,

                                        Petitioners

v.

EDWARD DIFIDELTO; DIRECTOR, OFFICE
OF WORKERS' COMPENSATION PROGRAMS,

                                        Respondents


_____

On Petition for Review of an Order
of the Benefits Review Board
(BRB No. 03-0705)

_____


Argued October 26, 2005

BEFORE:  SLOVITER, FISHER, and GREENBERG, Circuit Judges

(Filed: March 13, 2006)

_____


John E. Kawczynski (argued)
Field, Womack & Kawczynski
137 South Broadway
Suite B-1
South Amboy, NJ 08879

   Attorneys for Petitioners Delaware River
   Stevedores, Inc. and Liberty Mutual
   Insurance Company and for
   Amicus Curiae Weeks Marine, Inc.

David M. Linker (argued)
Freedman & Lorry
400 Market Street
Suite 900
Philadelphia, PA 19106

   Attorneys for Respondent Edward DiFidelto

Howard M. Radzely
Solicitor of Labor
Donald S. Shire
Associate Solicitor
Mark A. Reinhalter
Counsel for Longshore
Richard A. Seid (argued)
United States Department of Labor
Office of the Solicitor
200 Constitution Avenue, N.W.
Washington, DC 20210

   Attorneys for Respondent Director,
   Office of Workers'
   Compensation Programs

—————

OPINION OF THE COURT

—————

GREENBERG, Circuit Judge.

## I. INTRODUCTION

This matter comes on before this court on a petition for review of a disposition of the Benefits Review Board ("Board") awarding benefits to Edward DiFidelto under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901-950, following his sustaining an injury compensable under the LHWCA. The sole issue in these proceedings is whether Delaware River Stevedores, Inc. ("DRS"), DiFidelto's employer, had authority under a provision of the LHWCA, 33 U.S.C. § 908(j) ("section 908(j)"), to require DiFidelto to report information regarding his earnings when it

was not paying him compensation at the time of its requests.[1] Section 908(j) provides that an employer may inform a "disabled employee" of his obligation to report his earnings to the employer from employment or self-employment and further provides that if the employee fails to report or knowingly or willfully omits or understates his earnings, he forfeits his right to compensation with respect to any period during which he was required to file the report. Knowledge of the amount of an employee's earnings may be useful to an employer as those earnings may enable it to reduce or even eliminate the obligation that it otherwise would have to make payments to a disabled employee on account of a work-related injury.[2]


## II.  FACTUAL AND PROCEDURAL HISTORY

The material facts and procedural history with regard to these proceedings are not in dispute.  On January 7, 2000, DiFidelto suffered a work-related injury in the course and scope of his employment with DRS entitling him to receive benefits from DRS under the LHWCA.  Initially, DRS voluntarily made the payments without an adjudication or order, but on November 19, 2001, it discontinued them as it controverted its obligation to do so on the basis of a medical opinion that DiFidelto had recovered fully from his injuries.  When DRS controverted DiFidelto's claim, it requested the District Director of the Office of Workers' Compensation Programs to refer the case to the Office of Administrative Law Judges.  Not surprisingly, DiFidelto rejected DRS's position, and thus he prosecuted a claim for benefits under the LHWCA.

After DRS requested a hearing in the case, and at a time that it no longer was making payments to DiFidelto, it sent three Forms LS-200 to his attorney, pursuant to section 908(j), seeking information about his earnings from employment or self-employment.  The Director, Office of Workers' Compensation Programs ("Director"),

---

[1] Liberty Mutual Insurance Company, which insures DRS, is also a party to these proceedings but as a matter of convenience we will treat DRS and Liberty Mutual as a single party.

[2] See 33 U.S.C. § 922; see also Metro. Stevedore Co. v. Rambo, 515 U.S. 291, 296-97, 115 S.Ct. 2144, 2147-48 (1995); Deweert v. Stevedoring Servs. of Am., 272 F.3d 1241, 1247-48 (9th Cir. 2001).

3

adopted Form LS-200 for the reporting of earnings pursuant to section 908(j). The first and second forms that DRS sent on January 25 and February 21, 2002, respectively, identified the reporting period as being from January 7, 2000, to January 21, 2002. Thereafter, on April 22, 2002, DRS sent DiFidelto's attorney a third Form LS-200 requesting information about DiFidelto's earnings between January 7, 2000, and April 22, 2002. Although DiFidelto received DRS's requests, he refused to report his earnings as he contended that he did not have a legal obligation to do so as long as DRS was not paying him compensation.

An administrative law judge ("ALJ") held a hearing in this case on July 18, 2002, following which on June 2, 2003, he issued his "Decision and Order" awarding DiFidelto benefits. In his June 2, 2003 Decision and Order, the ALJ found, inter alia, that even though DiFidelto was entitled to reinstatement of his compensation payments, he had "forfeited" his right to compensation for the period between January 8, 2000, and April 22, 2002, because he failed to report his earnings as DRS requested.

In reaching this result, the ALJ indicated that forfeiture penalties apply if an employee fails to respond or responds inaccurately to a Form LS-200 request. In considering the applicability of the section 908(j) reporting requirement, the ALJ determined that "the decisive factor is whether earnings information is sought for 'periods during which an employee's earnings could affect employer's liability for compensation.'" App. at 56 (quoting Plappert v. Marine Corps Exch., 31 Ben. Rev. Bd. Serv. 13, 17, aff'd, 31 Ben. Rev. Bd. Serv. 109 (1997) (en banc)). Inasmuch as DRS's LS-200 request covered a period for which DiFidelto sought and obtained compensation, the ALJ applied the forfeiture to that period and denied him compensation from January 8, 2000, to April 22, 2002.

DiFidelto then filed a timely request with the ALJ to reconsider the June 2, 2003 Decision and Order. In support for his argument against forfeiture, DiFidelto relied on the regulation implementing section 908(j), 20 C.F.R. § 702.285(a), and the legislative history of section 908(j), as set forth in a House of Representatives Conference Report. DiFidelto contended that both authorities describe a "disabled employee" within section 908(j) as an individual to whom the employer is paying compensation when it requires an earnings report. Clearly, even though DRS had paid DiFidelto compensation, it was not doing so when it sent him the LS-

4

200 forms and thus DiFidelto, at that time, did not consider himself to be a disabled employee for purposes of section 908(j).

On June 30, 2003, the ALJ issued a "Decision and Order Granting Claimant's Request for Reconsideration." In the June 30, 2003 Decision and Order, the ALJ corrected technical deficiencies in the June 2, 2003 Decision and Order with respect to the time periods during which DiFidelto was entitled to total versus partial compensation.[3] The ALJ, however, rejected DiFidelto's request that the ALJ reconsider his findings with respect to the forfeiture of benefits as the ALJ adhered to his view that, according to Plappert, the reporting obligation applies to any period during which the employee claims compensation.

On July 17, 2003, DiFidelto filed a timely appeal to the Board. DiFidelto argued again that a "disabled employee" must be receiving compensation when the employer asks for his earnings information pursuant to section 908(j). A divided three-judge panel on July 19, 2004, issued its "Decision and Order" in which it affirmed the order of the ALJ awarding compensation at a partial rate but vacated the ALJ's order on the forfeiture issue and remanded the case to the ALJ to make further findings regarding DiFidelto's compensation status at the time DRS requested that DiFidelto complete and return the LS-200 forms. The dissenting member would have reversed the ALJ outright on the forfeiture issue because, in her view, DiFidelto was not a disabled employee within section 908(j) when DRS sent him the LS-200 forms.

On July 27, 2004, the Director filed a "Motion for Reconsideration and a Motion to Hold [the DiFidelto] Appeal in Abeyance" with the Board to await its decision in Briskie v. Weeks Marine, Inc., 38 Ben. Rev. Bd. Serv. 61 (2004), another appeal then pending before it concerning the same issue involved here. DiFidelto and DRS joined in the Director's request. Before the Board ruled on the July 27, 2004 motion, it decided Briskie on August 25, 2004. In Briskie the Board concluded that section 908(j) was "somewhat ambiguous," and thus it looked to the section's implementing regulation and legislative history for guidance on the forfeiture issue. Ultimately, the Board held in Briskie that section 908(j) applied only during a period in which an employer was paying compensation.

---

[3]We are not concerned with these corrections.

5

In light of <u>Briskie</u>, DRS's resort to forfeiture was foreclosed in this case, and thus the Board panel upheld DiFidelto's entitlement to the entire compensation award. On October 8, 2004, the Board issued its final order in this case, styled as an "Order on Motion for Reconsideration," in which, relying on <u>Briskie</u>, it reversed the ALJ's Decision and Order on the forfeiture issue. On December 6, 2004, DRS timely filed a petition for review with this court.[4]

## III. JURISDICTION AND STANDARD OF REVIEW

The Board had jurisdiction over DiFidelto's appeal because he timely filed his petition for review of the ALJ's decision. <u>See</u> 33 U.S.C. § 921(c); 20 C.F.R. §§ 702.393, 802.206(a). The Director timely filed a motion for reconsideration of the Board's July 19, 2004 order, which led to the Board's October 8, 2004 order at issue here. We have jurisdiction over DRS's petition for review as it timely filed it within 60 days of the Board's October 8, 2004 order on reconsideration. <u>See</u> 33 U.S.C. § 921(c); 20 C.F.R. § 802.410(a). Venue is proper in this court, as DiFidelto suffered his work-related injury in New Jersey. <u>See</u> 33 U.S.C. § 921(c).

Our review of a Board's decision for an error of law is plenary. <u>Dir., OWCP v. E. Associated Coal Corp.</u>, 54 F.3d 141, 146 (3d Cir. 1995). While we offer minimal deference to the Board's statutory or regulatory interpretations, "we give judicial deference to the Director, as policymaker." <u>Id.</u> at 147. When we review an agency's construction of a statute, if the intent of Congress is clear, we must give effect to that intent. <u>Chevron, U.S.A. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781 (1984). If the statute is silent or ambiguous with respect to a particular issue, then we must defer to the agency's regulation if it is based on a reasonable construction of the statute. <u>Id.</u> at 843, 140 S.Ct. at 2782. When considering whether the regulation complies with

[4]Of course, in <u>Briskie</u> the Board adopted the position that DiFidelto espouses here. In that case the employer, Weeks Marine, Inc., which is an amicus curiae in this case, filed a petition for review with the United States Court of Appeals for the Second Circuit but the court denied the petition in a not precedential summary order in <u>Weeks Marine, Inc. v. Briskie</u>, No. 04-5426, 2006 WL 140580 (2d Cir. Jan. 18, 2006).

6

Congress's mandate:

> We look to see whether the regulation harmonizes with the plain meaning of the statute, its origins, and its purpose. . . . So long as the regulation bears a fair relationship to the language of the statute, reflects the views of those who sought its enactment, and matches the purpose they articulated, it will merit deference.

E. Associated Coal Corp., 54 F.3d at 147 (quoting Sekula v. FDIC, 39 F.3d 448, 452 (3d Cir. 1994)).  We also must "defer to an agency's consistent interpretation of its own regulation unless it is plainly erroneous or inconsistent with the regulation." Dir., OWCP v. Mangifest, 826 F.2d 1318, 1323 (3d Cir. 1987) (internal citations and quotations omitted).


## IV.  DISCUSSION

It is evident from Chevron that in these proceedings dealing with statutory construction, we must make an initial determination, and, depending upon our first determination, possibly make a second determination.  As might be expected, each side argues that section 908(j) unambiguously requires that we decide the case in its favor. DRS contends that a person is a "disabled employee" within section 908(j) at the time of injury, i.e., the moment at which his incapacity to earn wages arises.  Thus, regardless of DiFidelto's possible medical recovery, DRS contends that he is a disabled employee within section 908(j).  On the other hand, DiFidelto and the Director argue that "disabled employee" for purposes of section 908(j) must mean an individual to whom "compensation for disability" is being paid at the time that the employer sends the individual a Form LS-200.

This division of views is understandable inasmuch as neither section 908(j) nor any other provision of the LHWCA defines "disabled employee."  The LHWCA does indicate that "[d]isability" means "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment . . .," 33 U.S.C. § 902(10),  and "employee" means, with exceptions not germane here, any person "engaged in maritime employment . . . ."  Id. at § 903(3).  Nevertheless it is not clear that we should combine these two terms to define "disabled employee" for

7

purposes of section 908(j) without regard for whether the employer is paying compensation to him when it seeks earnings information from the employee inasmuch as section 908(j) simply does not address this point explicitly.

This case involves an application of section 908(j) when an employee's actual physical condition changes or may have changed as DRS initially voluntarily paid DiFidelto compensation and then discontinued doing so when it asserted that he had recovered from his injury. Certainly, it is possible that the term "disabled employee" within section 908(j) may have a temporal element so that an employee originally disabled may not always thereafter be regarded as disabled within that section. Indeed, it is ironical that although DRS asserts that DiFidelto was a disabled employee when it sent him the Form LS-200 requests, it thought that he had recovered from his injury, whereas DiFidelto claims that at that time he was still physically disabled.

As we have indicated, the Director and DiFidelto make an argument that a disabled employee "must mean an individual to whom 'compensation for disability' is being paid pursuant to § 908." Director's br. at 24; see DiFidelto br. at 12. But we are not convinced that Congress's intent is unmistakable on this point. In this regard we point out that although the term "disabled employee" for purposes of section 908(j) need not necessarily be linked to the definitions of "disability" and "employee" in sections 902(3) and (10), it would not be unreasonable to link them because an employer legitimately might want to know whether an employee's capacity to earn his wages had been impaired even though the employer is not paying him compensation. After all, as is the case here, an injured employee might seek compensation from an employer declining to pay it, and, if the employer is required to pay benefits, the employee's earnings could reduce or even eliminate the compensation payments the employer otherwise would be obliged to pay.

Yet there is a limitation on an employer's need to know the amount of an employee's earnings at a time that the employer is not paying compensation because even if an employee "knowingly and willfully omits or understates any part of [his] earnings," see 33 U.S.C. § 908(j)(2), the employer may recover compensation it has paid only by "a deduction from the compensation payable to the employee." Id. at 908(j)(3). Moreover, if it is determined that an employee is not disabled and is not entitled to benefits, he will not be

8

required to refund earlier payments to which he had not been entitled, for in that circumstance he has an obligation to reimburse his employer only by deduction from ongoing compensation. See 33 U.S.C. §§ 914(j), 922. Thus, if DRS had demonstrated that DiFidelto had, in fact, not been disabled when DRS had been making payments to him, knowledge of the amount of his earnings during the time DRS had been making payments might not have been of assistance to DRS.

Furthermore, we point out that, as the Director has noted, section 908(j) is only one of three provisions in the LHWCA permitting an employer to recoup previously paid compensation. We consider all these provisions as they might give an employer reason to seek the Form LS-200 information. Thus, 33 U.S.C. § 914(j) provides that if an "employer has made advance payments of compensation, he shall be entitled to be reimbursed out of any unpaid installment or installments of compensation due." Additionally, 33 U.S.C. § 922 provides that an employer may obtain reimbursement from unpaid compensation if modification proceedings result in a decreased compensation rate that applies retroactively to past payments. But inasmuch as these provisions allow an employer to recoup advances or overpayments only from future payments, they are of no use to an employer so long as it is not paying compensation. Moreover, as we have indicated, the information that an employer might obtain from the answers to a Form LS-200 is of no use to an employer not currently making payments even if the employee had obtained his earlier payments through willful misreporting, for even in that aggravated circumstance the employee need not make repayments. See Lennon v. Waterfront Transp., 20 F.3d 658, 661 (5th Cir 1994); Stevedoring Servs. of Am. v. Eggert, 953 F.2d 552, 555-57 (9th Cir. 1992).[5] Indeed, the Director in his brief states that this limitation on the source of funds from which the employee must make repayment

_____

[5]H.R. Rep. No. 98-570(I) at 18 (1984), reprinted in 1984 U.S.C.C.A.N. 2734, 2751, indicates that:

> If compensation had already been paid during the period for which the employee failed to file a report, or willfully and knowingly underreported such earnings, the amount of compensation paid during that period may be withheld from future compensation payments due to the employee. The Committee does not contemplate that the employer could bring a cause of action to recover compensation paid in the past.

9

extends even to fraud cases. Director's br. at 30.

Nevertheless, though we conclude that the information that an employer might obtain from the answers to a Form LS-200 may be of no use to it if it is not paying compensation, still we believe that the Director overstates the information's lack of value when he asserts that "an employer has an <u>effective</u> remedy in forfeiture only if it also owes future compensation payments to the employee. Forfeiture affords no relief to an employer otherwise, and the proceedings would be an exercise in futility." Director's br. at 30 (emphasis in original). While it may be that the answers to a Form LS-200 are useless to an employer in advance payment, retroactive modification, and misrepresentation cases if the employer is not making payments, as we have explained the answers might be valuable to an employer not making payments in cases involving disputes over employees' right to ongoing or future compensation. As the Director acknowledges, "[i]f the employee eventually obtains an award and the employer begins paying compensation, then the employer may request earnings information concerning any period of disability covered by the award." Director's br. at 33, n.17. See Plappert, 31 Ben. Rev. Bd. Serv. at 17.

The Director asserts that inasmuch as an employer who starts to pay compensation may request a statement of the employee's earnings at that time, it "gains no advantage by seeking the information before it has any use for it." Director's br. at 33 n.17. We are, however, far from certain that an employer who is obliged to pay compensation does not obtain any benefit from having an employee's earnings information before the payments are due. In this regard, we reiterate that the answers to a Form LS–200 could reveal information that might allow an employer to reduce the amount of or even eliminate the payments for which it is liable. Thus, the Director's position seems to overlook the difference between starting and stopping payments, and the necessary delay between these events, and not starting them or starting them in a reduced amount by reason of an employee's earnings. We, however, are of the view that this narrow possibility, to which DRS seems not to refer in its briefs, should not lead us to reach a different result than that we reach.[6] Overall, we think that section 908(j) is ambiguous so the intent of

_____

[6]We are not suggesting that our result would have been different if DRS had advanced this possible benefit to an employer from the answers to a Form LS-200.

10

Congress is not clear with respect to the issue before us. Thus, we need to make the second determination in the <u>Chevron</u> methodology that we set forth above, and ascertain if the implementing regulation, 20 C.F.R. § 702.285(a), is based on a reasonable construction of section 908(j).

We do not think that our second determination is difficult. To start with, there can be no doubt that the regulation, as supported by the legislative history of section 908(j), indicates that the result that the Board reached was correct. In fact DRS admits as much, though it challenges the validity of the regulation as it asserts that it is inconsistent with section 908(j). The regulation builds on section 908(j) because that section provides that a "disabled employee" must report earnings upon request, and the implementing regulation states:

> An employer . . . may require <u>an employee to whom it is paying compensation</u> to submit a report on earnings from employment or self-employment.

20 C.F.R. § 702.285(a) (emphasis added); see also 20 C.F.R. § 702.286(a).[7] We think that the regulation hardly could be clearer. Moreover, the legislative history as explained in a House of Representatives report, though perhaps not so clear as the regulation, provides:

> The Committee does not intend . . . to authorize a requirement that all employees receiving compensation benefits file semi-annual reports of earnings. <u>Such reports are intended to be a device by which employers may maintain some control over claims in payment status.</u> Whether such reports are to be required remains the employer's option.

H.R. Rep. No. 98-570(I), at 18 (1984), reprinted in 1984 U.S.C.C.A.N. 2734, 2751 (emphasis added). Overall, it is beyond question that inasmuch as DRS made its requests to DiFidelto to report his earnings at a time when it was not paying him compensation, insofar as the regulation governed the requests, DiFidelto was not obliged to respond.

---

[7]The Secretary of Labor through the Director adopted 20 C.F.R. § 702.285(a) and Form LS-200 exercising the Secretary's rule making authority. <u>See</u> 33 U.S.C. § 939(a).

We recognize, of course, that, as we already have stated, the regulation must be based on a reasonable construction of the statute. On this point, for the reasons that we have set forth with respect to the ambiguity of section 908(j) that we will not repeat, we have no doubt that it does. Indeed, this case is a textbook example of when Chevron deference applies. Accordingly, DiFidelto was not obliged to respond to the Form LS-200 requests so that his failure to respond did not cause him to suffer a forfeiture.

## V. CONCLUSION

For the foregoing reasons, the petition for review will be denied.

*Delaware River Stevedores, et al. v. Edward DiFidelto, etc.*

No. 04-4531


FISHER, *Circuit Judge*, concurring.

I agree that the regulation here should be upheld. I write separately because I disagree with the way in which the majority dismisses the inference that a statute which defines a noun has thereby defined the adjectival form of that noun. *See* Maj. Op. at 7 (quoting statutory definitions of "disability" and "employee" in 33 U.S.C. § 902(3) and (10), but holding that "it is not clear that we should combine these two terms to define 'disabled employee' . . ."). To me the answer is not so obvious. The grammatical imperatives of our language ought not to be disregarded casually, and were there nothing more before us than the statutory language and the implementing regulation, I would be hard-pressed to overlook the linguistic inconsistency between them. In this case, though, there is more, and to me that makes the difference. In my view, congressional acquiescence in the agency's interpretation is evidence of ambiguity in the statutory language.

It is impossible to mechanically separate the "plain meaning" and "reasonable interpretation" components of the *Chevron* analysis. If one tries to do so in this case, one is faced with a conundrum. The statute defines "employee" and "disability," but the implementing regulation uses the term "disabled employee" to mean something quite different from "employee with a disability." To be sure, Congress's attention to definitional detail may simply have been lax in this regard; the legislative history indicates that the drafters of the statute probably had in mind a regulatory scheme of the sort adopted by the agency, as opposed to that advocated by the petitioner here. *See* H.R. Conf. Rep. No. 98-1027, at 33 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2734, 2783. Nonetheless, "Congress's constitutional voice is the text of the statutes it enacts," *Szehinskyj v. Attorney Gen. of the United States*, 432 F.3d 253 (3d Cir. 2005), and while legislative history is often informative, we should be hesitant to take a statute's legislative history, in and of itself, as dispositive of the statute's apparently plain textual meaning.

But legislative history is not the only interpretive resource

13

available to us in this case.  The courts have long recognized that the meaning of a statute may be inferred partly from the course of its implementation over time.  The seminal statement of this principle remains that of Justice Lamar:

> It may be argued that while these facts and rulings prove a usage they do not establish its validity.  But government is a practical affair intended for practical men.  Both officers, law-makers and citizens naturally adjust themselves to any long-continued action of the Executive Department – on the presumption that unauthorized acts would not have been allowed to be so often repeated as to crystallize into a regular practice.  That presumption is not reasoning in a circle but the basis of a wise and quieting rule that in determining the meaning of a statute or the existence of a power, weight shall be given to the usage itself – even when the validity of the practice is the subject of investigation.

*United States v. Midwest Oil Co.*, 236 U.S. 459, 473 (1915).

In *Midwest Oil*, the question was whether the President had the authority to withdraw tracts of public land from mineral exploration, in apparent contravention of statutes that provided for such exploration.  The Court held that Congress had implicitly acquiesced in such withdrawals by failing to amend the relevant statutes over a period of decades during which many withdrawals had been made.  The Court counted at least 252 withdrawals to which Congress had thus tacitly consented.  The executive branch, the Court concluded, was acting as Congress' agent, implementing the legislative will as is its constitutional duty.  Congress watched the executive at its work, but at no point did it "repudiate the action taken"; therefore, "[Congress'] silence was its acquiescence.  Its acquiescence was equivalent to consent to continue the practice until the power was revoked by some subsequent action by Congress."  236 U.S. at 481.[8]

---

[8]I would lay particular stress on two interpretive points: First, my invocation of *Midwest Oil* is in no respect a comment on the relationship between the respective inherent constitutional magisteria of Congress and the President.  Second, the case at bar involves a "systematic, unbroken, executive practice, long pursued

14

Of course statutory interpretation has come a long way since 1915, but the central insight of *Midwest Oil*, that in the search for statutory meaning, "weight shall be given to the usage itself," is very much at home in the *Chevron* era. And the usage in this case is powerful evidence of statutory meaning.[9] The regulation at issue here has been in effect for over 20 years. It has been applied, not 252 times, but 66,000 times in the past year alone. *Longshore and Harbor Workers Compensation Program Fact Sheet*, http://www.dol.gov/esa/owcp/dlhwc/lsfact.htm (Labor Department website, listing number of workers receiving disability benefits under the LHWCA in 2005).[10] Pursuant to this regulation, the Department of Labor distributes some $747 million in benefits each year. *Id.* This case does not involve a long-dormant provision revived and turned to a new and dubious purpose; nor does it involve a "suspen[sion] or repeal" of duly enacted legislation. *Midwest Oil*, 236 U.S. at 505 (Day, J., dissenting). It involves instead a popular government program which has been consistently administered in just this manner since its inception. And Congress, which has not hesitated to amend the LHWCA in the past, *see* Pub. L. 92-576, 86 Stat. 1251 (1972);

---

*to the knowledge of the Congress* and never before questioned," *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring) (emphasis added), as opposed to a practice kept secret from either Congress or the public.

In appealing to legislative acquiescence in this case, in other words, I do not in any way open the twin cans of worms of inherent executive authority and executive action pursued in secret. In this case the power exercised by the Secretary of Labor was wielded pursuant to statute, and was wielded openly and publicly.

[9]The question whether congressional acquiescence shapes meaning or is evidence of meaning is, though of undoubted philosophical interest, of little practical moment here.

[10]That is to say, in each of those 66,000 cases, the statute, implemented through the regulation, gave the injured worker's employer or insurance carrier (or in some cases, the Labor Department itself) the right to request income verification reporting by the employee, but only while compensation is being paid.

15

Pub. L. 98-426 (1984), has not thought it necessary to do so here.

Nor have private parties objected. The Court's searches have revealed only two challenges to the legality of this regulation: this case, and a companion case brought in the Second Circuit, both filed by the same law firm. *See Weeks Marine v. Briskie*, No. 04-5426, 2006 U.S. App. LEXIS 1497 (2d Cir. Jan. 18, 2006) (finding statutory language ambiguous and deferring to agency interpretation). The scope of the filing requirement under 20 C.F.R. § 702.285(a) is simply not an issue over which practical men and women, as democratic participants in the practical affairs of government, have had any disagreement. "The very strength of this consensus . . . and congressional silence after years of [agency and] judicial interpretation support[] adherence to the traditional view." *Gen. Dynamics Land Sys. v. Cline*, 540 U.S. 581, 594 (2004).[11]

Not all regulations that come before us to be interpreted will have enjoyed such consistent application and longstanding congressional acquiescence. In the absence of such evidence, I would be less likely to find ambiguity in the type of grammatical alteration at work here. But I am convinced that in this case, the consistent historical application of the statute is ample evidence that "there is such variation in the connection in which the words

---

[11]There is perhaps a certain irony in citing *General Dynamics* here, insofar as *General Dynamics* appealed to congressional acquiescence in *rejecting* a claim of statutory ambiguity and overturning an agency's interpretation of a statute it administered, while here we appeal to congressional acquiescence in finding the statutory language ambiguous so as to affirm the agency's interpretation. (The text in the lacuna above reads "is enough to rule out any serious claim of ambiguity.") The difference, though, is just the difference between the facts of the two cases. In this case, it would probably stretch the language too far to hold that it unambiguously requires the agency's reading. *Accord Weeks Marine*, *supra*, 2006 U.S. App. LEXIS 1497 at *6 n.4.

are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent," *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932), and that "given the statutory aims and circumstances, a hypothetical member [of Congress] would likely have wanted judicial deference in this situation." Stephen Breyer, *Active Liberty* 106 (2005).

I therefore agree with the majority that the statutory language, insofar as it conflicts with longstanding agency practice in addition to the legislative history, is ambiguous, and that deference is due to the agency's reasonable interpretation.